UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GOODEARTH MARITIME LTD.,                          :

          Plaintiff,                                :        08 CV 2028 (RMB)
                                                                            ECF CASE

     - against -                                    :

CALDER SEACARRIER CORP.,                          :
a.k.a. CALDER SEA CARRIER CORP.,
ROLSTON ENTERPRISES LTD., and              :
FENBY COMPANY LIMITED a.k.a. FENBY
CO. LTD.,                                                       :

         Defendants.                          :
-------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT


TISDALE LAW OFFICES, LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 (phone)
(212) 869-0067 (fax)

*Attorneys for Plaintiff*
*Goodearth Maritime Ltd.*


Lauren C. Davies, Esq.
Thomas L. Tisdale, Esq.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ...........................................................................................................2

FACTS ..........................................................................................................................2

ARGUMENT
POINT I
PLAINTIFF HAS SUFFICIENTLY PLED ITS
ALTER-EGO ALLEGATIONS AGAINST FENBY ...........................................................2

   A. PLAINTIFF HAS MET ITS BURDEN UNDER RULE B ...........................................4

   B. DEFINING ALTER EGO ......................................................................................5

   C. UNDER AQUA STOLI, A RULE B PLAINTIFF MUST PLEAD A PRIMA
      FACIE ALTER EGO CLAIM TO SURVIVE A MOTION TO VACATE ..................7

   D. THE PLAINTIFF HAS ADEQUATELY PLEAD A PRIMA FACIE ALTER
      EGO CLAIM AGAINST FENBY ...........................................................................11

CONCLUSION..............................................................................................................15

i

# TABLE OF AUTHORITIES

## Cases

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,*
460 F.3d 434, 2006 U.S. App. LEXIS 19302, at *35 (2d Cir. 2006)………3,4,5,7,9,10,13

*C. Transport Panamax Ltd. v. Kremikovtzi Trade E.O.O.D., et. al.,*
07 CV 893 (LAP), 2008 U.S. Dist. LEXIS 48688, *8-9, (S.D.N.Y. June 19, 2008)…...3,6

*Carte Blanche (Singapore) v. Diners Club Intern,*
758 F. Supp. 908 (S.D.N.Y. 1991)……………………………………………………...5

*Dolco Investments v. Moonriver Development,*
486 F. Supp. 2d 261 (S.D.N.Y. 2007)……………………………………………13,14

*FESCO Ocean Mgmt. v. High Seas Shipping Ltd.,*
2007 U.S. Dist. LEXIS 19970 (S.D.N.Y. March 2007)…………………………………9

*Hawknet Ltd. v. Overseas Shipping Agencies, et.al.,*
2008 U.S. Dist. LEXIS 25542 (S.D.N.Y. 2008)………………………………….3,4,10

*Kirno Hill Corp. v. Holt,*
618 F.2d 982 (2d Cir. 1980)……………………………………………………………5

*Maersk, Inc. v. Neewra, Inc.,*
2006 U.S. Dist. LEXIS 53395 (S.D.N.Y. 2006)………………………………………10

*Maryland Tuna Corp. v. MS Benaries,*
429 F.2d 307 (2d Cir. 1970)……………………………………………………………6

*OGI Oceangate Transp. Co. Ltd. v. RP Logistics Pvt. Ltd.,*
No. 06 CV 9441 (RWS), 2007 U.S. Dist. LEXIS 46841, at *4
(S.D.N.Y. June 26, 2006)………………………………………………………………9

*Padre Shipping Inc. v. Yong He Shipping, et. al.,*
2008 U.S. Dist. LEXIS 34428 (S.D.N.Y. April 25, 2008)…………………………3,4,9

*Route Holding Inc. and Beam Company v. IOOI and Marina World Shipping,*
06 Civ. 3428 (PKC)………………………………………………………………...3,4,8

*Secil Maritima U.E.E. v. Malev Shipping  Co. Ltd., et. al.,*
No. 06 Civ. 6345………………………………………………………………….3,4,9

*SPL Shipping Ltd. v. Gujarat Cheminex Ltd.,*
2007 U.S. Dist. LEXIS 27822 (S.D.N.Y. April 2007)...........................................9

*Tideline, Inc. v. Eastrade Commodities, Inc., et. al.,*
2006 U.S. Dist. LEXIS 95870, 06 CV 1979 (KMW)....................3,4,5,7,8,10,13,14

*Wajilam v. ATL Shipping,*
475 F. Supp. 2d 275 (S.D.N.Y. 2006).........................................................9

*Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty. Ltd.,*
 519 F. Supp. 2d 399 (S.D.N.Y. 2007)..................................................3,4,9,13

*Winter Storm Shipping, Ltd. v. TPI,*
310 F.3d 263 (2d Cir. 2002)..................................................................14

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,*
933 F. 2d 131 (2d Cir. 1991)..................................................................5

## INTRODUCTION

Plaintiff, Goodearth Maritime Ltd. ("Goodearth" or "Plaintiff") by and through its undersigned counsel, Tisdale Law Offices, LLC, respectfully submits this Memorandum of Law in Opposition to Defendant Fenby Company Limited's ("Fenby" or "Defendant") Motion to Vacate the maritime attachment issued pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). Defendant's Motion to Vacate should be denied because Plaintiff has adequately alleged a *prima facie* alter-ego claim against Fenby. Defendant's assertions to the contrary ignore recent case law and are unavailing.

## FACTS

The facts pertaining to the instant Motion to Vacate the process of maritime attachment and garnishment as against Fenby are more fully set forth in the accompanying Declaration of Lauren C. Davies dated July 8, 2008 (hereinafter "Davies Decl.") The facts stated in the Declaration are incorporated by reference herein. In addition, this Memorandum of Law will make reference to, and discuss as necessary the facts set forth in the Declaration.

## ARGUMENT

### POINT I

### PLAINTIFF HAS SUFFICIENTLY PLED ITS ALTER-EGO ALLEGATIONS AGAINST FENBY

Plaintiff has adequately alleged its alter-ego claims against Fenby Company Limited. Fenby's arguments to the contrary ignore the weight of numerous recent decisions and are unpersuasive. In order to maintain an attachment against an alter-ego of the principal defendant at a Rule (E)(4)(f) post-attachment hearing, it is now indisputable that a plaintiff need only

establish that it has sufficiently alleged a prima facie alter-ego claim. This burden is met when

the plaintiff alleges the nature of its maritime claim and the basis upon which it is claiming alter-

ego, e.g. fraud or domination/control. "Maritime plaintiffs are not required to prove their case at

this stage." *See, e.g., C. Transport Panamax Ltd. v. Kremikovtzi Trade E.O.O.D., et. al.,*07 CV

893 (LAP), 2008 U.S. Dist. LEXIS 48688, *8-9, (S.D.N.Y. June 19, 2008). As will be

demonstrated herein, it is no longer necessary for a plaintiff to show probable cause or

reasonable grounds to support its claim in a Rule (E)(4)(f) post-attachment hearing.

    The Second Circuit Court of Appeals has explicitly ruled that it is improper for a court to

engage in a fact intensive inquiry regarding the technical requirements of Rule B at a Rule

E(4)(f) post-attachment hearing. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d

434, 2006 U.S. App. LEXIS 19302, at *35 (2d Cir. 2006). In addition, it is now nearly axiomatic

that it is unnecessary to examine the factual underpinnings of a plaintiff's alter-ego claims in a

Rule (E)(4)(f) post-attachment hearing. *See Tideline, Inc. v. Eastrade Commodities, Inc., et. al.,*

2006 U.S. Dist. LEXIS 95870, 06 CV 1979 (KMW); *see also Transcript of Rule E(4)(f) hearing*

*dated September 29, 2006 in Route Holding Inc. and Beam Company v. IOOI and Marina World*

*Shipping*, 06 Civ. 3428 (PKC) *annexed hereto as Exhibit "A;" see further C. Transport*

*Panamax, supra,* at *8-9. As such, to survive a motion to vacate by an alter ego defendant, the

plaintiff's burden is only to sufficiently plead alter ego such that the *prima facie* standard has

been met. *See Aqua Stoli, supra; see Tideline, supra; see also Secil Maritima U.E.E. v. Malev*

*Shipping Co. Ltd., et. al., No. 06 Civ. 6345 annexed hereto as Exhibit B; Wilhelmsen Premier*

*Marine Fuels AS v. UBS Provedores Pty. Ltd.*, 519 F. Supp. 2d 399 (S.D.N.Y. 2007)*; see further*

*Padre Shipping Inc. v. Yong He Shipping, et. al.,* 2008 U.S. Dist. LEXIS 34428 (S.D.N.Y. April

25, 2008); *see further Hawknet Ltd. v. Overseas Shipping Agencies, et.al.,* 2008 U.S. Dist.

LEXIS 25542 (S.D.N.Y. 2008). The facts presented in the *Tide Line, Route Holdings, Secil Maritima, Wilhelmsen, Padre Shipping,* and *Hawknet* cases are strikingly similar to the instant matter, and their respective holdings, denying the defendants' alter-ego based challenges, decisively establish that Plaintiff has met its burden in this case. Even assuming *arguendo* that Plaintiff must make a factual showing at this stage, which is denied, Plaintiff has set forth sufficient evidence in its Verified Amended Complaint, this memorandum and the accompanying Davies Declaration showing that Calder Sea Carrier Corp. ("Calder") and Fenby are alter-egos of each other.

## A. PLAINTIFF HAS MET ITS BURDEN UNDER RULE B

Under Supplemental Rule B, "an order of maritime attachment must issue upon a minimal prima facie showing" provided that the defendant cannot be "found within" the district in which the assets are sought to be attached. But under Supplemental Rule E(4)(f), any person claiming an interest in the attached property shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment should not be vacated or other relief granted consistent with these rules. It is clear from the text of Rule E(4)(f) that the party having obtained the maritime attachment, bears the burden of showing that the attachment should not be vacated.

However, as recently confirmed by the Second Circuit Court of Appeals in *Aqua Stoli, supra,* the Rule(E)(4)(f) hearing is not intended to resolve the dispute between the parties, but to determine if the technical requirements of the Rule were met. Thus, as long as the plaintiff can establish that it has alleged a prima facie maritime claim, the defendant is not present in the district, the defendant's property has been restrained in the district and no other statutory bar to

the attachment exists, the attachment should be upheld. *See Aqua Stoli*, at \*28-29; *see also Tideline, supra.*

Once a plaintiff has established the technical requirements stated in Rule B, the burden shifts to the defendant to prove the limited bases for vacateur. *Aqua Stoli* provides that an otherwise facially valid Rule B attachment may only be vacated upon three bases none of which are present here. *See Aqua Stoli,* at \*27.

## B.    DEFINING ALTER EGO

Under federal common law, the corporate form will be ignored and liability imposed on another corporate entity or the principals, if it is shown that the interconnected organization was utilized to perpetrate a fraud *or* where one entity or individual(s) so dominated another that it was, in effect, carrying on the principal's business. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980). In a maritime case, it is sufficient to allege that the parent or controlling principal so dominated the subsidiary or other units within the group such that they were mere tools or instrumentalities to carry on the overall business of the principal. *See Kirno Hill,* 618 F.2d at 985 *and Matter of Holburn,* 774 F. Supp. at 844 (S.D.N.Y. 1991).

While there is no precise test to determine whether an entity is an alter-ego of another, in general, the corporate veil may be pierced where it can be demonstrated that the parent or controlling entity was the 'true' or prime mover behind the subsidiary. *See Carte Blanche (Singapore) v. Diners Club Intern,* 758 F. Supp. 908, 918 (S.D.N.Y. 1991). In *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F. 2d 131, 139 (2d Cir. 1991) the Second Circuit listed a number of factors that should be considered in determining whether to pierce the corporate veil:

> 1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issues of stock, election of directors, keeping of

corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms' length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and 10) whether the corporation in question had property that was used by the other of the corporations as if it were its own. *See generally,* Barber, *Piercing the Corporate Veil*, 17 Willamette L. Rev. 371, 398 (1981); *Directors Guild of America v. Garrison Prod.*, 733 F.Supp. 755, 760-61 (S.D.N.Y. 1990); *United States Barite Corp. v. M/V Haris*, 534 F. Supp. 328, 330 (S.D.N.Y. 1982).

*Id.*

Obviously, many of the documents required to establish some of these elements are solely in the control of the Defendants and discovery on these issues will be necessary. However, the Verified Amended Complaint sets forth sufficient evidence which establishes the alter-ego relationship between Calder and Fenby. *See Verified Amended Complaint, ¶¶31-36.*

At this stage in the proceeding, Plaintiff need not establish an alter-ego relationship to the degree expected at trial. Evidence of corporate domination or fraud is seldom available to the public, and a claimant is not expected, at this early stage, to produce fully documented alter-ego claims. Otherwise, a corporation that held their records tightly would be immune from suits based on alter-ego relationships. *See Maryland Tuna Corp. v. MS Benaries*, 429 F.2d 307 (2d Cir. 1970). In fact, the weight of the case law in this district states that "a plaintiff seeking a maritime attachment need not provide any supporting evidence." *C. Transport Panamax, supra,* at \*9. Plaintiff has submitted sufficient evidence to show that there is cause to believe that Defendants Calder and Fenby are alter-egos in order to sustain the attachment at an (E)(4)(f) post-attachment hearing. Further, with the benefit of discovery, Plaintiff will easily reveal the

alter ego relationship between these companies, which is observable even on the evidence Plaintiff has collected so far.

### C.    UNDER AQUA STOLI, A RULE B PLAINTIFF MUST PLEAD A PRIMA FACIE ALTER EGO CLAIM TO SURVIVE A MOTION TO VACATE

*Aqua Stoli's* holding marks a departure from the prior "probable cause/reasonable basis standard" that certain courts applied before *Aqua Stoli*. As confirmed by Chief Judge Wood in *Tide Line* and its extensive following, a plaintiff no longer needs to show that it had "reasonable grounds" or "probable cause" to make alter-ego claims against a defendant in order to maintain the attachment. Rather, at the Rule E(4)(f) hearing a plaintiff must only show that it has *alleged* a prima facie valid alter-ego claim in order to satisfy Rule B.

In *Tide Line,* as in the instant case, the plaintiff obtained a Rule B order of maritime attachment and garnishment against both Eastrade Commodities Inc. as the named entity in the charter party, and Transclear S.A. as its alter-ego. Transclear moved to vacate the attachment claiming that it was not an alter-ego of Eastrade. Tide Line then produced evidence that Transclear occasionally paid Eastrade's debts where it had no connection to the underlying contract. Transclear then claimed that is had a legal basis upon which to make the payments on Eastrade's behalf.

Judge Wood found all of these factual arguments unnecessary and irrelevant in the post-attachment hearing. Particularly, she found that in light of the *Aqua Stoli* decision, the Court should exercise a very limited inquiry into the underlying facts. She reasoned that when applying for a Rule B attachment, a plaintiff *need not provide any supporting evidence*; its complaint should suffice. In keeping with this principal, she held that *Aqua Stoli* implies that a plaintiff *is likewise not required to provide evidence showing that it has a claim against*

*defendant*, to carry its burden under Supplemental (E)(4)(f) at the post-attachment hearing. *See Tide Line, supra,* at \*38-39.

Judge Wood noted that "in seeking to have an attachment vacated, a defendant may argue that a plaintiff does not have a "valid prima facie admiralty claim against the defendant." However, she further clarified that such a challenge must be based on *insufficiency of pleading. See Tide Line Order, at 17 annexed hereto as Exhibit "C"* ("it does not appear that the basis of defendant's argument may be that plaintiff has not provided sufficient evidence of such a claim"). Thus, the only way for a defendant to show that a plaintiff does not have a maritime claim against an alter-ego is to prove that the pleadings themselves are insufficient to state such a claim.

In *Route Holding*, following the *Tide Line* precedent, the district court limited its analysis to determining whether the Plaintiffs, Route Holding and Beam Company, has *sufficiently pled* their alter-ego claims against Marina World Shipping. The plaintiffs had alleged that Marina World Shipping was an alter-ego because it dominated and controlled the principal, IOOI. The district court found that plaintiffs' pleadings were enough to uphold the attachment, finding that "the plaintiff alleges that MWS is the alter-ego of IOOI, but it does not simply leave it as a conclusory allegation. It goes on to allege that the reason it believes it is the alter-ego is because IOOI dominates and disregards MWS' corporate form to the extent that MWS is actually carrying on IOOI's business and operations as if the same were its own. It further goes on to allege that MWS, acting as paying agent, acts a paying agent or arranges for other nonparties to satisfy the debts and obligations of IOOI. *It seems to me a sufficient allegation." See Transcript of Route Holding annexed hereto as Exhibit "A," at 12, lines 14-24.*

Further emphasizing the state of the law, on October 11, 2006, Judge Hellerstein denied a near identical alter-ego challenge raised by Defendants' in *Secil Maritima U.E.E. v. Malev Shipping Co. Ltd., Evalend Shipping Co. S.A. and Plumfield Shipping Corp., 06 CV 6345 (AKH), annexed hereto as Exhibit "B"*(denying defendants' motion to vacate an attachment under Rule B based on the relaxed post-*Aqua Stoli* standard).

More recently, in *Wilhelmsen Premier Marine Fuels A.S. v. UBS Provedores Pty. Ltd., et. al.,* 519 F. Supp. 2d 399 (S.D.N.Y. 2007), the court stated that the "majority of courts in this district have understood *Aqua Stoli* to require the application of the *prima facie* standard when considering the adequacy of a claim in a marine vacatur motion." *Id.* at 408. In denying the defendant's motion to vacate the maritime attachment, Judge McMahon stated that "this court agrees with the weight of authority in this district and will apply the *prima facie* standard." *Id.* at 409; *see also, OGI Oceangate Transp. Co. Ltd. v. RP Logistics Pvt. Ltd.,* No. 06 CV 9441 (RWS), 2007 U.S. Dist. LEXIS 46841, at *4 (S.D.N.Y. June 26, 2006)( stating that the proper inquiry is whether plaintiff has pled a prima facie claim according to the majority of decisions interpreting Aqua Stoli); *see further FESCO Ocean Mgmt. v. High Seas Shipping Ltd.,* 2007 U.S. Dist. LEXIS 19970 (S.D.N.Y. March 2007)(suggesting *Aqua Stoli* mandates the application of the *prima facie* standard); and *see SPL Shipping Ltd. v. Gujarat Cheminex Ltd.,* 2007 U.S. Dist. LEXIS 27822 (S.D.N.Y. April 2007)(finding the proper standard to be the *prima facie* standard despite one post *Aqua Stoli* decision (*Wajilam v. ATL Shipping,* 475 F. Supp. 2d 275 (S.D.N.Y. 2006)) stating otherwise).

Similarly, in *Padre Shipping Inc. v. Yong He Shipping, et. al.,* 2008 U.S. Dist. LEXIS 34428 (S.D.N.Y. April 25, 2008), Judge Keenan stating that following *Aqua Stoli,* the majority of the courts in this district have held that the proper standard is the prima facie standard). Most

recently, on April 29, 2008 Judge Buchwald issued another decision in support of the prima facie

standard. In *Hawknet Ltd. v. Overseas Shipping Agencies, et al.*, 2008 U.S. Dist. LEXIS 25542

(S.D.N.Y. 2008), the court explained that:

> The Aqua Stoli decision has been the subject of considerable recent discussion in
> the district. As we explained in Fesco Ocean Mgmt. Ltd. v. High Seas Shipping
> Ltd., 2007 U.S. Dist. LEXIS 19970, at *2 (S.D.N.Y. March 12, 2007), prior to
> that decision, it had been suggested that a plaintiff needed to present "reasonable
> grounds" for sustaining an attachment. However, we read Aqua Stoli as strongly
> suggesting that courts should limit their Rule B inquiries to whether the plaintiff
> has stated a prima facie basis for the maritime attachment at issue. Subsequent
> decisions have agreed with this conclusion.

*Hawknet, supra,* at *6-7 n.4.

Thus, in light of *Aqua Stoli, Tide Line* and their numerous descendants, the current state

of the law is that a plaintiff need only allege a prima facie maritime claim against the principal

defendant, and a prima facie alter-ego claim against the alleged alter-ego entity in order to satisfy

its burden in this regard. As indicated above, the Second Circuit Court of Appeals held in *Aqua*

*Stoli* that it is *inappropriate* for a court to conduct a fact-intensive inquiry regarding the specifics

of a plaintiff's claim at a post-attachment hearing. Rule E(4)(f) does not afford a defendant the

opportunity to challenge the sufficiency of the plaintiff's pleadings or challenge the evidence

supporting plaintiff's admiralty claim. A defendant may, if it wishes, raise such issues by way of

a Rule 12(b)(6) motion to dismiss or Rule 56 motion for summary judgment but it may not do so

in the context of an emergency hearing pursuant to Supplemental Rule E(4)(f). *Maersk, Inc. v.*

*Neewra, Inc.*, 2006 U.S. Dist. LEXIS 53395 (S.D.N.Y. 2006) (refusing to apply the higher

pleading standard used in a motion to dismiss in a post-attachment hearing "lest Rule 12(b)(6) be

completely subsumed by Supplemental Rule E(4)(f)").

Defendant Fenby brought a motion to vacate under Rule E(4)(f), thus, the limited question presented to the Court is, "has Plaintiff adequately pled a *prima facie* alter-ego claim?" The answer is an unqualified yes.

## D.    THE PLAINTIFF HAS ADEQUATELY PLEADED A PRIMA FACIE ALTER EGO CLAIM AGAINST FENBY

Plaintiff has met its pleading burden by properly alleging a *prima facie* maritime claim against Fenby. *See Verified Amended Complaint,* ¶¶ 31-36 *annexed to the Declaration of Lauren C. Davies as Exhibit "1."* In addition, Plaintiff has repeatedly alleged in its Verified Amended Complaint, this memorandum, and its accompanying Declaration, that Calder and Fenby are alter-egos and that Fenby is therefore liable for Calder's breach of the maritime contract with the Plaintiff. Particularly, Plaintiff made the following allegations in its Verified Amended Complaint:

*            *            *

31.    Upon information and belief, Defendant Fenby is the alter ego of Defendant Calder because Calder dominates and disregards Fenby's corporate form to the extent that Calder is actually carrying on the business and operations of Fenby as if the same were its own.

32.    Upon information and belief, Defendants Fenby and Calder share a common address of: Voula, Vas. Pavlou, Athens, Greece and common phone (+30210-9659910) and fax numbers (+30210-9659466).

33.    Upon information and belief, Defendant Fenby is a shell-corporation through which Defendant Calder conducts its business.

34.    Upon information and belief, Defendant Fenby has no separate, independent identity from Defendant Calder.

35.    Upon information and belief, Fenby has been described in the shipping industry as a "paper company." Further, the Plaintiff commissioned company searches through Lloyd's MIU and Factiva which yielded no results except that Fenby is registered in the Marshall Islands.

36.    In the further alternative, Defendants Fenby and Calder are partners or joint venturers.

*            *            *

*See Verified Amended Complaint,* ¶¶31-36.

In additional to the alter-ego allegations described above, which Plaintiff submits are more than sufficient to make a *prima facie* alter-ego claim against defendant Fenby, additional alter-ego allegations have been discovered since the filing of Fenby's motion to vacate. Most notably, it is now known that Fenby is a paying agent of Calder's and has made payments on behalf of Calder. The wire transfer attached pursuant to the PMAG issued in this matter on June 20, 2008, being transferred from Fenby Company Limited at Calder's Voula V. Pavlou address in Athens, was being sent to Baja Ferries USA LLC referencing "M/V RENATA – Payment of Freights." *See Davies Decl. ¶¶ 31-37; Exhibits 2-3.* As it turns out, the M/V RENATA was on charter to Calder from Baja Ferries and the wire transfer attached was Calder's freight payment on this Vessel. *See Davies Decl. ¶¶ 31-37; Exhibits 2-3.* Thus, Fenby has paid freight on a vessel chartered to Calder.

Furthermore, Mr. Panos Michalitses, the person who signed the Declaration as "manager of Fenby Company Limited" in the instant motion to vacate has also signed a Declaration on behalf of and as "manager in the chartering department of Calder Seacarrier Corp." in an action filed in this Court entitled *Calder Seacarrier Corp. v. Viking Marine S.A., et. al.,* under docket number 07 CV 6520 (LAK). *See Davies Decl. ¶¶ 38-41, 43, Exhibits 4-5.* In addition, Mr. Michalitses has filed a Declaration purporting to be the "manager responsible for the Operation Department of Universal Cargo Lines" in an action filed against Calder by DS Bulk Pte. Ltd. under docket number 05 CV 10146 (SHS). *See Davies Decl. ¶¶ 44-46; Exhibits 6-9.* In the Universal Cargo Lines ("UCL") action, it was alleged that UCL was an alter ego/paying agent of Calder. *See Davies Decl. ¶¶ 43-45, Exhibit 6.* In all three of the cases in which Mr. Michalitses has filed declarations on behalf of Calder, Fenby and UCL, counsel for Fenby herein has been their appointed counsel. *See Davies Decl ¶¶46-47, Exhibits 4-9.*

12

As shown above, Plaintiff has not only alleged the basis of its alter-ego claim, domination and control, but it has set forth facts upon which its claim is based. In its moving papers, Fenby's counsel alleges that the complaint merely alleges that Fenby and Calder share an address and that "evan that one allegation is, in fact, erroneous." *See Memo. In Support of Motion to Vacate at 1.* This is simply not true. As enumerated above, the Plaintiff has made several detailed allegations regarding the alter ego relationship between Calder and Fenby including specific evidence of common telephone numbers, fax numbers and addresses. *See Verified Amended Complaint,* ¶¶*31-36.*

Allegations such as these have universally been considered as sufficient alter ego allegations in this district since the *Aqua Stoli* and *Tide Line* decisions. For example, in *Route Holdings,* Judge Castel found that allegations such as these satisfied the plaintiff's burden to allege a claim sufficient to withstand a challenge such as the one Fenby has made here. *See Transcript of Route Holdings at 12, lines 15-24.* Furthermore, in *Wilhelmsen Premier,* Judge McMahon refused to vacate the maritime attachment against the moving alter ego defendant based upon the inclusion of the alter ego allegations of common ownership and control in the Verified Amended Complaint. *Wilhelmsen, supra,* at 409.

The instant case is distinguishable from *Dolco Investments v. Moonriver Development,* 486 F. Supp. 2d 261 (S.D.N.Y. 2007), a case heavily relied upon by Fenby in their brief. In *Dolco,* Judge Sweet vacated the attachment but granted plaintiff's motion to file an amended complaint after finding that "Dolco fails to meet [its] burden because it has not included any factual allegations … other than the conclusory allegation of domination." *Id.* at 272-3. Unlike the plaintiff in Dolco, Goodearth has made several allegations of alter ego in its Verified Amended Complaint. Furthermore, the *Dolco* court was bound to a higher standard as the

defendant therein moved to vacate the attachment pursuant to Rule E(4)(f) and moved to dismiss pursuant to Fed. R. Civ. P. Rule 12(b). It is also noteworthy that even in Fenby's key case, the court followed the *prima facie* standard outlined in *Tideline* and that even under the reasoning of Judge Sweet in *Dolco*, the plaintiff herein has satisfied its burden. In the event that this Court disagrees with Plaintiff's arguments herein, Plaintiff respectfully requests leave to file a Verified Second Amended Complaint to include the additional alter-ego evidence discovered since the filing of this motion by Fenby.

In conclusion, Plaintiff has shown by way of its Verified Amended Complaint, Memorandum, and Declaration, that it has a valid *prima facie* admiralty claim and that Fenby is an alter-ego of Calder such that it is liable for Calder's debts to Plaintiff. Also, Defendant effectively concedes that it is not present in the District, and acknowledges that its property in the form of EFTs was attached in the District. *See Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002). Additionally, the Defendant, Fenby, has failed to cite any statutory or common law bar to the attachment. As such, this Court's issuance of the maritime attachment pursuant to Rule B was proper. Fenby's insistence that the Plaintiff's pleadings are insufficient and that the Plaintiff must prove its entire alter-ego case in a Rule E(4)(f) motion is based entirely on outdated case law and is in disregard of the purpose of the emergency Rule E(4)(f) hearing. Based on all the foregoing, Defendant's motion to vacate attachment was improper, and this case should be allowed to proceed in the normal course, with the attachment remaining in place for the reasons set forth herein.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court

deny Defendant's Motion to Vacate in all respects and grant such other and further relief as the

Court deems necessary and appropriate.

Dated: July 8, 2008
    New York, NY


                    The Plaintiff,
                    GOODEARTH MARITIME LTD.,


        By:
                    Lauren C. Davies (LD 1980)
                    Thomas L. Tisdale (TT 5263)
                    TISDALE LAW OFFICES, LLC
                    11 West 42nd Street, Suite 900
                    New York, NY 10036
                    (212) 354-0025 – phone
                    (212) 869-0067 – fax
                    ldavies@tisdale-law.com
                    ttisdale@tisdale-law.com

## AFFIRMATION OF SERVICE

I hereby certify that on July 8, 2008, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____
    Lauren C. Davies (LD 1980)

# EXHIBIT "A"

```
69TVROUA                    Argument                          1
   1   UNITED STATES DISTRICT COURT
   1   SOUTHERN DISTRICT OF NEW YORK
   2   ------------------------------x
   2
   3   ROUTE HOLDING INC., BEAM
   3   COMPANY INC.,
   4
   4                    Plaintiffs,
   5
   5              v.                        06 CV 03428 (PKC)
   6
   6   INTERNATIONAL OIL OVERSEAS
   7   INC. a/k/a IOOI, MARINA WORLD
   7   SHIPPING CORP.,
   8
   8                    Defendants.
   9
   9   ------------------------------x
                                           New York, N.Y.
  10                                       September 29, 2006
  10                                       11:30 a.m.
  11
  11
  12   Before:
  12
  13                      HON. P. KEVIN CASTEL,
  13
  14                                       District Judge
  14
  15                      APPEARANCES
  15
  16   TISDALE & LENNON LLC
  16        Attorneys for Plaintiffs
  17   NANCY R. PETERSON
  17   PATRICK F. LENNON
  18
  18   FREEHILL HOGAN & MAHAR LLP
  19        Attorneys for Defendants
  19   MICHAEL E. UNGER
  20   LAWRENCE J. KAHN
  20
  21
  22
  23
  24
  25            SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

2

69TVROUA                    Argument

```
 1              (In open court)
 2              (Case called)
 3         THE COURT:  This is Route Holding, Inc. v.
 4    International Oil Overseas, Inc.
 5         Is the plaintiff ready?
 6         MS. PETERSON:  Yes, your Honor.
 7         THE COURT:  State your appearance please.
 8         MS. PETERSON:  My name is Nancy Peterson from the firm
 9    Tisdale & Lennon, representing the plaintiffs Route Holding and
10    Beam Company.
11         THE COURT:  All right.  And for the defendant?
12         MR. UNGER:  Good morning, your Honor.  Michael Unger
13    from Freehill, Hogan & Mahar on behalf of the defendant Marina
14    World Shipping.  With me is my associate Larry Kahn.
15         THE COURT:  Good to see you.  Good to see you again,
16    Mr. Kahn.
17         MR. KAHN:  Good morning, your Honor.
18         THE COURT:  Good morning.  All right.  We are here on
19    the defendant's motion to vacate the maritime attachment.
20    Since the issuance of the maritime attachment in this case, we
21    now all have the benefit of the Second Circuit's decision in
22    Aqua Stoli, 460 F.3d 434, and also Judge Wood's very clear and
23    helpful decision in Tide Line, Inc. against the Eastrade
24    Commodities, Inc., and Transclear, S.A.  That was an opinion
25    issued by Judge Wood on August 15 -- I'm sorry, August 5th,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

69TVROUA                         Argument

1    2006; docket number is 06 CV 1979. And as of seven minutes
2    ago, it had not yet appeared on Westlaw.
3         It does seem clear to me that we know what we're doing
4    here this morning in that the attachment was issued pursuant to
5    Supplemental Rule B.
6         We're now at the hearing under Rule E(4)(f), and it is
7    the party who obtained the ex parte attachment's burden to show
8    why the arrest or attachment should not be vacated or other
9    relief granted consistent with these rules. So the party
10   obtaining the attachment may proceed.
11        MS. PETERSON:  Your Honor, Aqua Stoli set forth the
12   burden that plaintiff needs to satisfy in order to maintain the
13   attachment.
14        In order for Rule B attachment to issue, a plaintiff
15   must show that it has met the following four technical
16   requirements:
17        That it has alleged a maritime claim; that the
18   defendant is not found in the district; that the plaintiff has
19   attached defendant's funds within the district; and that no
20   other statutory bar to maritime attachment exists.
21        In addition, Aqua Stoli stands for the proposition
22   that the plaintiff's burden does not change at the Rule E
23   hearing. The burden to obtain an attachment is the same as the
24   burden to maintain an attachment. Judge Wood further clarifies
25   that.

4

69TVROUA                    Argument

1          THE COURT:  Well, let's back up for a second.  I'm not
2    sure that I agree with your statement of what Aqua Stoli held.
3    If you look at -- well, I'm not going to be able to give you an
4    exact page number; I don't have an F.3d version of it.  But the
5    text preceding Footnote 5, it recites that the plaintiff has to
6    show that it "has," not alleges, has a valid prima facie
7    admiralty claim against the defendant.  That's slightly
8    different than -- and maybe more than slightly different than
9    alleges a claim.
10         MS. PETERSON:  Right.  But Judge Wood clarifies in her
11   opinion that what having a prima facie claim amounts to is
12   properly alleging the elements of a maritime claim, and then an
13   alter ego claim.
14         She expressly stated that it is inappropriate to
15   engage in a fact-intensive inquiry as to the facts underlying
16   either the maritime claim or the alter ego allegations.
17         THE COURT:  But she points out that there is a
18   heightened pleading standard in a case brought, I guess
19   invoking maritime or admiralty jurisdiction, is that correct?
20         MS. PETERSON:  The heightened standard is to make the
21   defendant aware what he is pleading.
22         In the case of Tide Line, there was no alter ego
23   allegation made.  The only allegation that was made was that
24   the defendant was a paying agent of the interconnected entity.
25         In the case here, the plaintiff has alleged all the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

69TVROUA                         Argument

1   elements of federal common-law alter ego claim; namely, that
2   IOOI is an alter ego of Marina World Shipping; and that IOOI
3   dominates and controls Marina World Shipping to the extent that
4   it actually conducts business through Marina World Shipping.
5   It's completely separate factual -- it's distinguishable from
6   that case.
7                   After we had satisfied our burden, the defendant has
8   three basis upon which it can vacate the attachment according
9   to Aqua Stoli; namely, that the defendant can be found in a
10  convenient adjacent jurisdiction that the defendant can obtain
11  personal jurisdiction in a district where the plaintiff is
12  located or that the plaintiff has obtained sufficient security.
13              Aqua Stoli explicitly listed the three bases upon
14  which the defendant may vacate an attachment.  It left the door
15  open for some equitable concerns; however, those equitable
16  concerns are not here today.  Defendant is a debtor who's not
17  paying its debts.  And if our case is borne out, as we suggest
18  it will be, it will turn out that IOOI and Marina World
19  Shipping are the same company who are avoiding paying their
20  debts to the plaintiffs.
21              Defendant is relying on outdated case law when it
22  suggests that we must prove a probable cause or a reasonable
23  basis, reasonable grounds standard for making our alter ego
24  allegations.  Once we have satisfied the basic elements of a
25  maritime claim and an alter ego claim, we have satisfied our

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

6

69TVROUA                    Argument

1    burden in that regard.
2             Plaintiff has alleged a maritime claim against IOOI
3    that it has breached the maritime contract, and it has alleged
4    the alter ego claim against Marina World Shipping.
5    Furthermore, in subsequent submissions, we have submitted a
6    raft of evidence showing a relationship between IOOI and Marina
7    World Shipping, which, according to both Judge Casey, in the
8    recent case of Maersk v. Neewra, is you can review in order to
9    determine if we had made adequate allegations.  In addition,
10   Judge Kaplan, in a recent case of Metalinvest v. Burwil
11   Resources also held that you review the entire record to
12   determine if we have met our basic pleading allegations.
13             As the plaintiff has satisfied its burden to show that
14   it has a prima facie claim, and defendant has not met its
15   burden to show the three reasons for vacatur, the attachment
16   should be upheld and the motion to vacate denied.
17             THE COURT:  Thank you, Ms. Peterson.  Let me hear from
18   Mr. Unger.
19             MR. UNGER:  Good morning, your Honor.  Let me begin by
20   referring the Court to the advisory committee notes of Rule B.
21   Under those notes, it says contrary to whatever interpretation
22   plaintiffs want to put on Aqua Stoli, the defendant can attack
23   the pleadings for insufficiency or any other defect in terms of
24   the process.
25             Here, the defect is that the complaint is plainly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

69TVROUA                    Argument

1   insufficient to meet the standards required under Rule 8(a),
2   let alone the higher standard required under Rule 9(b).
3            The case law is such, and, in particular, I refer the
4   Court to In Re:  Currency Conversion Fee Anti --
5            THE COURT:  If I may just have you pause for a second.
6   Why do you invoke Rule 9(b)?
7            MR. UNGER:  Rule 9(b) is the specificity of pleading
8   rule, your Honor.
9            THE COURT:  I'm familiar with that.
10           MR. UNGER:  And here, the courts have said that
11  veil-piercing claims are generally subject to the pleading
12  requirements imposed by Rule 8(a), which requires only a short
13  and plain statement of the claim, showing that the pleader is
14  entitled to relief.
15           However, when a veil-piercing claim is based on
16  allegations of fraud, the heightened pleading standard Rule B
17  is the lens through which those allegations have to be
18  examined.  Okay.
19           Here, they haven't alleged fraud.
20           THE COURT:  So that goes back to my question.  Why are
21  you talking to me about Rule 9(b)?
22           MR. UNGER:  I just refer to Rule 9(b), but what I'm
23  saying is it doesn't even reach the lower standard of Rule 8.
24           THE COURT:  But we're in agreement Rule 9(b) does not
25  control in this case?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

69TVROUA                      Argument

1      MR. UNGER: That's correct, your Honor.
2      THE COURT: Okay. Thank you.
3      MR. UNGER: I apologize if it was confusing. But the
4   case I was referring to, In Re: Currency Conversion Fee
5   Antitrust Litigation, which is 265 F. Supp. 2d 385 Second
6   Circuit -- I'm sorry, Southern District 2003.
7          The Court stated in that case that purely conclusory
8   allegations cannot suffice to state a claim based on veil
9   piercing or alter ego liability, even under the liberal notice
10  pleading standard under Rule 8(a).
11         The plaintiff has to come in, and the plaintiff has to
12  demonstrate with proof, credible proof, that there is an alter
13  ego relationship between the two defendants that they've named.
14  Plaintiff only has a real cause of action and a real gripe with
15  IOOI with whom it had its contract, because IOOI didn't pay up
16  or hasn't agreed to post security, and I don't know exactly
17  where plaintiff and IOOI are in terms of their arbitration.
18         Plaintiff in this action decided that they were going
19  to come into court and add MWS, Marina World, as a defendant,
20  and that's a tactic that they are using in order to try to
21  strongarm either a settlement or the posting of security by
22  IOOI in connection with the London arbitration and the merits
23  of that dispute.
24         Turning back to the Aqua Stoli case. It's incorrect
25  to say that there were only three bases on which to challenge

9

69TVROUA                              Argument

1    an attachment.  The Second Circuit specifically said in Aqua
2    Stoli that among the bases to challenge are, and it proceeds to
3    list the three examples that counsel for the plaintiff cited.
4         THE COURT:  And then they go on to further define the
5    universe by saying, "We also believe vacatur is appropriate in
6    other limited circumstances," which are well-described in the
7    opinion.  And they also describe what circumstances do not
8    qualify for vacating the attachment.  Go ahead.
9         MR. UNGER:  Here, your Honor, what we're challenging,
10   effectively, is that there is no maritime claim.  And,
11   therefore, the Court lacks subject-matter jurisdiction in
12   respect to the claims against Marina World.  And the reason the
13   Court lacks subject-matter jurisdiction is because there is no
14   alter-ego relationship between the two named defendants.
15        THE COURT:  Where do I find your subject-matter
16   jurisdiction argument laid out?
17        MR. UNGER:  It's not specifically set forth as such in
18   our papers, your Honor; but what we do argue is that there is a
19   defect in the pleadings.  And that's the defect.  The defect is
20   that there is a lack of jurisdiction here.  And there's a lack
21   of jurisdiction because there is no, in fact, alter-ego
22   relationship between the companies; and there is no -- the way
23   that it's pled in the complaint, that doesn't suffice under
24   Rule 8(a) to state a maritime claim.
25        The Aqua Stoli case says, in effect, that plaintiff

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

69TVROUA                    Argument

1   has to show that it has a valid maritime claim, okay. And if
2   that's the case, you're allowed to test the validity of whether
3   that claim that they are alleging is valid.
4        Here, this Court has the right to look at the
5   evidence. And plaintiff having the burden of proof, they
6   haven't shown a maritime claim against Marina World. And the
7   reason they haven't is that the evidence that they have put
8   forth, and let's look at what they put forth, before they ever
9   filed the claim, all they knew was there were a couple of
10  payments that had been made over eight years by Marina World on
11  behalf of IOOI. And Mr. Bakri from Marina World explains in
12  his several declarations why that was done. That's been
13  unchallenged. And I don't believe that that gave a good-faith
14  basis to file this complaint in the first place.
15       But even if you get past that and you look at the rest
16  of the evidence, what do we have? A couple more payments we
17  learn have been made. But that's it. Then you get into all
18  the plaintiff's smoke-and-mirrors in terms of trying to tie
19  Marina World and IOOI together. And, quite frankly, your
20  Honor, they don't even come close.
21       The evidence that they show at best is based on
22  speculation, rumor, innuendo, hearsay from unnamed "market
23  sources" and investigations that were commenced. They give you
24  a four-year old report in connection with IOOI and its supposed
25  relationship with the Bakri group, which Mr. Bakri explains is

11

69TVROUA                    Argument

1  basically a loose association of companies that try to
2  capitalize on the goodwill of one another.
3        You have, in addition to that, plaintiff coming in
4  with all kinds of suggestions in terms of the fact that there
5  are shared addresses, IT information that's shared.  None of
6  this adds up to putting Marina World being so dominated or
7  controlled by IOOI or the converse, that they can meet the
8  ten-point tests that are set out in terms of what you have to
9  show in order to have an alter-ego claim.
10       At best, all plaintiff has done is shown, if you want
11 to accept it, that IOOI may have some kind of relationship with
12 the Bakri group, Bakri navigation, and any of the 12 or 13
13 other companies that are named throughout the course of the
14 papers.  But what's not in any of that is Marina World in this
15 web that they've painted.  Marina World is out here.  And
16 there's no evidence which ties Marina World directly to IOOI,
17 or to IOOI through the Bakri group, or any of the Bakri group
18 companies.
19       Effectively, if you follow plaintiff's argument, up on
20 the west side of Manhattan you have the Potamkin Auto Group.
21 And he's got ten different dealerships.  And if I buy a
22 Chrysler from Potamkin Chrysler, and I don't like it, under
23 plaintiff's theory, I could allege that their alter egos and go
24 after Potamkin Chevy.  Why?  Because Mr. Potamkin has his hand
25 in a whole bunch of these dealerships.  Mr. Potamkin may own
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

12

69TVROUA                    Argument

1   the various buildings or have a company that owns the various
2   buildings the dealerships are in. That doesn't get you over
3   the hump.
4           There's no good-faith basis to have brought this
5   claim. And they haven't shown it even when they've had the
6   burden of showing it, that there is an alter ego relationship.
7           Thank you, your Honor.
8           THE COURT: Thank you, Mr. Unger. Let me hear from
9   the plaintiff. And I guess a question I would like answered is
10  does supplemental Rule E(2)(a) apply as to the pleading. And
11  let me hear as to how does the plaintiff view that rule as
12  affecting its pleading obligation here.
13          MS. PETERSON: What do you explicitly mean by Rule
14  E(2)(a)? Do you mean the pleading requirement?
15          THE COURT: All right. There is a requirement that,
16  "The complaint state the circumstances from which the claim
17  arises with such particularity that the defendant or claimant
18  will be able, without moving for a more definite statement, to
19  commence an investigation of the facts and to frame a
20  responsive pleading."
21          And Second Circuit has held that this standard is more
22  stringent than the pleading requirements of the Federal Rules
23  of Civil Procedure. That's what I'm referring to.
24          MS. PETERSON: Your Honor, first, I believe that we
25  have satisfied that burden; and that we have stated the facts

13

69TVROUA                    Argument

1   and circumstances for having the breach of the contract and the
2   reasons behind us attaching the funds of Marina World Shipping;
3   namely, that they are in an alter ego relationship such that we
4   do not have to move for a more definite statement.
5          And, subsequently, we have submitted considerable
6   evidence in our various submissions and declarations clarifying
7   our pleadings and putting forth more evidence.
8          In addition, I don't believe that the standard -- that
9   we should apply a motion-to-dismiss standard at the Rule E
10  hearing.  We're not judging the sufficiency of the pleadings in
11  terms of a motion to dismiss any set of facts upon which relief
12  can be granted.  We're looking at a Rule E special hearing at
13  which we're seeing if the elements of the claim have been
14  alleged, and if the circumstances has also been alleged,
15  according to Rule B(a)(2).
16         Judge Casey explicitly addressed this in the case of
17  Maersk v. Neewra, where he said you can look at the entire
18  record to determine a pleading burden, unlike a motion to
19  dismiss; and that if we were to apply any set of facts or look
20  at the facts, Rule E would completely subsume Rule 12(b)(6).
21  There would be no difference, included there should be a
22  difference in the standard.
23         If the defendants would like to challenge the facts
24  underlying our pleadings, they should raise a motion to dismiss
25  or a motion for summary judgment.  However, that is the
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

14

69TVROUA                          Argument

1    appropriate form in which to challenge them.  Right now we're
2    looking at the bare bones of the complaint and our supplemental
3    submissions.
4              May I add a few -- address their argument?
5              First of all, as to the subject-matter jurisdiction
6    argument that they have made, the defendant does not dispute
7    that we have alleged a maritime claim against IOOI.  We have
8    alleged an alter-ego claim against Marina World Shipping.
9    Therefore, it's an alter-ego maritime claim.  In the
10   subject-matter jurisdiction, it's not relevant and wasn't
11   briefed by the defendants.
12             THE COURT:  In other words, what you're saying is even
13   if for some reason I accepted everything that the defendants
14   said and tomorrow granted a motion to dismiss Marina World from
15   this case, this Court's subject-matter jurisdiction would not
16   evaporate?
17             MS. PETERSON:  Exactly.
18             THE COURT:  Thank you.  Go ahead.
19             MS. PETERSON:  As to the evidence, where they are
20   attacking the evidence as hearsay and in the declarations, they
21   are holding us to a trial standard.  This is the Rule E
22   hearing.  You can submit any sort of evidence at this stage to
23   support your allegations.  And we can submit case law to
24   support that, if your Honor would like.
25             In addition, there is no case law to suggest that we

15

69TVROUA                        Argument

1   have to submit proof at this stage of the hearing to support
2   our allegations.  Aqua Stoli and Judge Wood found that proof at
3   this stage is inappropriate; and that would be going directly
4   against her decision, I feel, to require to submit all facts at
5   this stage prior to discovery or being able to use discovery
6   tools to obtain evidence.
7           And even assuming arguendo that the defendants are
8   correct that we have to make some sort of evidentiary showing,
9   which we vigorously deny, we have shown significant evidence
10  that IOOI and Marina World Shipping are, in fact, alter egos.
11          Even without the benefit of discovery, we have
12  uncovered 15 payments being made by Marina World Shipping on
13  behalf of IOOI.  There's been no evidence submitted to show
14  that there was -- Mr. Bakri claims that there's an assignment
15  of payment.  However, there's absolutely no paper, there's no
16  evidence of a debt being assumed from Marina World Shipping to
17  IOOI, there's no evidence of an assignment actually being made,
18  and the people that received the payments can confirm that they
19  were never informed of an assignment.  The only evidence is a
20  self-serving statement that a payment assignment can be made.
21          And it suspends disbelief to believe that in these 15
22  separate incidences that we know about, they executed
23  assignments of payment.  In addition, IOOI refers to Marina
24  World Shipping's account as its own.  In the two instances
25  where IOOI owed money to a creditor, and it informed them that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

it would be sending money from its bank, when the confirmation came through, it was from Marina World Shipping. It is referring to Marina Shipping as its own account and using it as its piggy bank. Its role is to sign the maritime documents; Marina World Shipping's job is to pay the debts. And in this way, it completely insulates IOOI and the Bakri family-at-large from liability.

IOOI and Marina World Shipping reside at the same location in Saudi Arabia at the Al Dulas Bakri Building owned by a Bakri corporation. Mr. Bakri has submitted a lease allegedly showing that this is an arm's length transaction that Marina World Shipping leases from the owner. However, this lease does not specify an office, a floor. This is a lease that specifies that they have leased somewhere in the Bakri building. This has no evidence to show that, in fact, they maintain a separate office or in any way separate from IOOI.

In addition, the directors of IOOI are all apparently employed by the Bakri family. Marina World Shipping directors are made up of all Bakri family members. IOOI's directors are all apparently employees of the Bakri corporations. One is in the legal department of a Bakri-owned corporation; one is a member of and works for a self-described company in the Bakri organization; and the other one works in another separate subsidiary of a Bakri corporation. There's clear ties between these directors.

17

69TVROUA                    Argument

1       Marina World Shipping and IOOI are one entity; the two
2   pockets in the same pair of pants.
3       The maritime report, which defendants claim is four
4   years old -- which is four years old, but which is equally
5   relevant today, shows that the Bakri family uses IOOI as their
6   chartering arm. They use it to enter into transactions. And,
7   as I said, Marina World Shipping is the piggy bank. They are
8   almost like two departments; they are the same company.
9       And, finally, the audit that Mr. Bakri submitted
10  allegedly to show that it has above-the-board records, reveals
11  that it enters into related party transactions regarding ship
12  charters. What these transactions are, I am unsure. However,
13  upon a minimal amount of discovery, I believe we can find out.
14  However, this in no way establishes that they are separate from
15  IOOI.
16      And, in addition, again, upon a minimal amount of
17  discovery, we believe we can uncover many more payments made on
18  behalf of Marina World Shipping -- made on behalf of IOOI by
19  Marina World Shipping.
20      The owners in this case have approached people in
21  order to find out about more payments; however, they came to
22  them and said we have a confidentiality clause in our charter
23  party. So they couldn't help even if they wanted to. Upon
24  being awarded discovery, we can certainly clarify how often
25  Marina World Shipping is certainly paying on behalf of IOOI.

18

69TVROUA                        Argument

1       And, as such, I believe plaintiff has met its burden,
2   either under the defendant's alleged pleading requirements or
3   under whatever Judge Wood's pleading requirements in Tide Line.
4   And for that reason, the attachment should be upheld.
5       THE COURT: Thank you. It is the plaintiff's burden,
6   and so the plaintiff gets to go first and last; but, Mr. Unger,
7   I'll give you an opportunity briefly if there's something
8   additional you wanted to say.
9       MR. UNGER: A couple real quick points, your Honor.
10  We're back to the has versus alleges argument in looking at
11  what they talked about. The evidence, it doesn't have to be
12  admissible at this stage, but it has to be credible. And it
13  has to support the allegations. And, quite frankly, the
14  evidence that they have does neither.
15      The allegation that Marina World hasn't supplied any
16  paper to document the assignments, it's not Marina World who
17  has the burden of proof, it's the plaintiff. And it was never
18  challenged by the plaintiffs, okay. The fact that IOOI says we
19  have instructed our bankers, I don't know why, but it certainly
20  is not compelling evidence that there is an alter-ego
21  relationship. And, in fact, the argument that Marina World is
22  used as IOOI's bank is undermined by the fact that IOOI paid
23  the settlement in the prior case, the Garda Shipping case,
24  which is referred to in the papers, out of its own funds.
25  They're holding the lease to U.S. standards rather than Saudi

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

69TVROUA                        Argument

1  standards; yet they don't have any evidence to show you what
2  the practice is in terms of Saudi leasing of offices.
3  Mr. Bakri is the only evidence that is before the Court, and
4  Mr. Bakri explains what happens.  Okay.
5          They never closed the circle between IOOI, the Bakri
6  group, and Marina World.  The four-year old report is not
7  relevant.
8          In terms of any suggestion as to discovery, discovery
9  has never been asked for prior to today, and it shouldn't be.
10 In terms of the suggestion that the motion should be held only
11 in terms of a summary judgment standard, basically that allows
12 the plaintiff then in any instance, with even the barest
13 whisper of a connection between two companies, to say, A is the
14 alter ego of B; and that alleged alter ego can't challenge it
15 until it's gone through miles and miles of legal hoops and
16 legal proceedings, effectively all the way to trial.
17         If Marina World had not challenged the money being
18 attached in this instance, look at what would have happened.
19 Plaintiff would have had to get a judgment -- I'm sorry, an
20 award in London against IOOI, and then seek to confirm that
21 award.  And then plaintiff would still have the burden of
22 proving down the road that IOOI and MWS are alter egos in order
23 to go ahead and collect a judgment here against MWS.
24         So it goes beyond the realm of common sense to say
25 that they shouldn't have to have that ability to go ahead at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

69TVROUA                    Argument

1   this early stage and have some credible evidence that the two
2   are linked in order to have taken the step that they have done.
3            MR. KAHN:  Your Honor, if I could be heard on just one
4   brief point brought up by plaintiffs regarding the Maersk v.
5   Neewra case, which was recently decided by Judge Casey, and the
6   dismissal standard that we're also seeking here.
7            As Mr. Unger said, the Court would still have
8   jurisdiction over the case generally, but only against IOOI if
9   the case is dismissed against Marina World.
10           And what occurred in the Maersk v. Neewra case, if you
11  look at it carefully, you'll see that the plaintiffs are
12  expanding what was actually said in that case.  In the Maersk
13  v. Neewra case, what happened was the defendant moved to vacate
14  the attachment on maritime attachment grounds, and then also
15  sought to dismiss a RICO cause of action on the grounds that it
16  was not sufficiently pled.  And the Court held that it was
17  improper at that time to attack the RICO cause of action in an
18  E(4)(f) hearing.  The Court found that there was no basis to do
19  that, particularly where the defendant had not yet appeared.
20           One slightly complicating wrinkle in that case was
21  that the defendant, who appeared only in the guise of garnishee
22  and not as the defendant, it was proven at the E(4)(f) hearing
23  that the garnishee actually was the defendant.  He was playing
24  a name game; he had essentially multiple IDs with slightly
25  different spellings of his name.  And Judge Casey saw through

21

69TVROUA                    Argument

1    that and saw this is all the same person.
2         But with respect to the standard for dismissal, Judge
3    Casey held that what was going on in that case was that it was
4    improper in the context of an R(4)(f) maritime hearing
5    concerning whether or not an attachment should be vacated to
6    challenge whether a RICO cause of action was sufficiently pled
7    under 9(b).
8         And so the reading urged by the plaintiffs here I
9    think is over-expansive, goes well beyond what Judge Casey
10   actually decided in the Maersk v. Neewra matter.
11        Thank you.
12        THE COURT:  Thank you.  On May 4th, 2006, I signed an
13   order directing the clerk to issue maritime attachment against
14   property of IGOI and Marina World.  Thereafter, I scheduled an
15   initial pretrial conference in this case, and had a conference
16   held on July 14th.  The defendant indicated a desire to move to
17   vacate the attachment, and I set a schedule for the motion to
18   be made four days later, set a date for replies, responses and
19   replies, and set a date for a hearing of August 1, 2006.
20        And there is certainly nothing unusual or
21   inappropriate about it, but I do want to make it plain for the
22   record, subsequently I received requests to adjourn the
23   hearing, including a letter request by Mr. Unger dated July
24   31st, which caused me to move it till August 28th.  And then a
25   further request from Ms. Peterson that it be adjourned to a

22

69TVROUA                    Argument

1   later date, and it was moved to today.  So that's what brings
2   us here today.
3               This is the hearing required under Rule E(4)(f) of the
4   supplemental rules for certain admiralty and maritime claims.
5   And the rule provides that whenever property is arrested or
6   attached, any person claiming an interest in it shall be
7   entitled to a prompt hearing at which the plaintiff shall be
8   required to show why the arrest or attachment should not be
9   vacated, or other relief granted consistent with these rules.
10              In the very recent decision of the Second Circuit in
11  Aqua Stoli, which is 2006 Westlaw, 2129336, and that is now
12  recorded at 460 F.3d 434 Second Circuit, July 31, 2006, the
13  Court had occasion to examine the historical underpinnings of
14  maritime attachment and the process by which maritime
15  attachment may be vacated.
16              I have spent some time with that opinion in examining
17  it, studying it, and I'm not going to endeavor to summarize it
18  here today.  But I do note that the holding of the Court is
19  that in addition to having to meet the filing and service
20  requirements of Rule B and E, an attachment should issue if the
21  plaintiff shows that, one, it has a valid prima facie admiralty
22  claim against the defendant; two, the defendant cannot be found
23  within the district; three, the defendant's property may be
24  found within the district; and, four, there is no statutory or
25  maritime law bar to the attachment.

23

69TVROUA                    Argument

1         And conversely says, Aqua Stoli, a district court must
2    vacate an attachment if the plaintiff fails to sustain his
3    burden of showing that he has satisfied the requirements of
4    Rule B and E.
5         The Court also outlined certain other limited
6    circumstances which do not appear to be relevant here.
7    Specifically, it outlined a circumstance where the defendant is
8    subject to suit in a "convenient adjacent jurisdiction, and
9    where the plaintiff could obtain in personam jurisdiction over
10   the defendant in the district where the plaintiff is located,
11   or the plaintiff has already obtained sufficient security for
12   the potential judgment by attachment or otherwise."
13        Those circumstances, i.e., the limited circumstances,
14   have no application in this case.
15        I conclude that the plaintiff has met the requirement
16   that the defendant cannot be found within the district; that
17   the defendant's property may be found within the district; and
18   that there is no statutory or maritime law bar to the
19   attachment.  I consider, however, whether a valid prima facie
20   admiralty claim against the defendant has been asserted.
21        Now, there is much discussion, and I suppose it will
22   be a continuing discussion, as to how a district court is to
23   determine whether there is a valid prima facie admiralty claim.
24   I think it is fair to say that after Aqua Stoli, it cannot
25   credibly be argued that there is a probability of success on

24

1   the merits type standard.  But I really don't, in this case,
2   have to spend too much time with whether it is something to be
3   determined solely from the face of the pleadings or whether
4   this Court can and should consider matters outside the four
5   corners of the pleading, because under either standard, I find
6   that the plaintiff has alleged a valid prima facie admiralty
7   claim.
8           I'm mindful of the dictates of supplemental Rule
9   E(2)(a), that there must be at least enough particularity so
10  that the plaintiff -- or, rather, the defendant can commence an
11  investigation of the facts and frame a responsive pleading; and
12  that this is a higher pleading requirement than the Rule 8(a)
13  requirement.
14          Here, the plaintiff alleges that MWS is the alter ego
15  of IOOI, but it does not simply leave it as a conclusory
16  allegation.  It goes on to allege that the reason it believes
17  it is the alter ego is because IOOI dominates and disregards
18  MWS's corporate form to the extent that MWS is actually
19  carrying on IOOI's business and operations as if the same were
20  its own.  It further goes on to allege that MWS, acting as
21  paying agent, acts as paying agent or arranges for other
22  nonparties to satisfy the debts and obligations of IOOI.
23          It seems to me that is a sufficient allegation.  If
24  and to the extent it is not a sufficient allegation, I look to
25  the declaration of Eara Anastasatou.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

69TVROUA                        Argument

1        Now, the declaration referenced goes into the issue of
2   common ownership and control, alleging that the two are a
3   single economic entity.  Some of the facts that are set forth
4   there are consistent with alter ego, but they could also be
5   consistent with one shareholder owning two separate
6   corporations.  There's nothing in law that prohibits a single
7   shareholder from doing business through separate corporations,
8   provided the separate corporate form is maintained.
9        But what I find impressive about the declaration is it
10  gives considerable particularity and description to instances
11  where MWS made a payment on behalf of IOOI, it gives chapter
12  and verse, it gives the details, it gives the time, the place,
13  and the circumstances, and it gives a number of examples.  And
14  so I find paragraphs 20 through 43 of the declaration to be of
15  particular help and utility.
16       The prerequisites for piercing the corporate veil are
17  as clear in federal maritime law as in shoreside law.  That's a
18  point that has been made in the Kirno Hill case; and it's clear
19  that the veil will be pierced only if a corporation is used by
20  another entity or individual to perpetrate a fraud or, the
21  operative word being "or," was so dominated that its corporate
22  form was disregarded and the notion that a way to prove veil
23  piercing is by showing that the alleged alter ego so dominated
24  and disregarded its alter ego's corporate form, that the alter
25  ego is actually carrying on the controlling party's business

26

69TVROUA                    Argument

1   instead of its own, is an extremely well-recognized,
2   well-established means of demonstrating corporate veil
3   piercing.
4           I look specifically to pages 25 to 27 of Judge Wood's
5   well-reasoned and thoughtful opinion in Tide Line, including
6   the citation up to the factors outlined in William Passalacqua
7   Builders v. Resnick.
8           Unlike Tide Line, of course, this is a case where the
9   alter ego allegation is on the face of the complaint.  Whether
10  I look at it in terms of the complaint or I look at it in terms
11  of the complaint taking into account the plaintiff's
12  submissions, as well as the defendant's submissions, and the
13  argument presented here today, I conclude that there is a valid
14  prima facie admiralty claim; that all other requirements of
15  Rule B and E have been met; that there is not a limited
16  circumstance, as outlined in Aqua Stoli, for vacating the
17  attachment under the limited circumstances doctrine.
18          So I conclude that the plaintiff has, at this hearing,
19  met each and every element of the plaintiff's burden; and,
20  therefore, the motion to vacate the attachment is denied.
21          Is there anything further?
22          MS. PETERSON:  No, your Honor.
23          MR. UNGER:  No, your Honor.
24          THE COURT:  Thank you all very much.
25                       *    *    *

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT "B"

Transcript of Hearing on October 10, 2006.txt

6aanma1n                                                              1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECIL MARITIMA,

                    Plaintiff,          New York, N.Y.

          v.                            06 Civ. 6345 (AKH)

MALEV SHIPPING, et al.,

                    Defendants.

------------------------------x

                                        October 10, 2006
                                        4:00 p.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                        District Judge

                         APPEARANCES

TISDALE & LENNON
     Attorneys for Plaintiff
BY:  PATRICK F. LENNON

CHALOS O'CONNOR & DUFFY
     Attorneys for Defendants
BY:  OWEN F. DUFFY
     BRIAN THOMAS McCARTHY

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

6aanma1n                                                              2
          (In open court)
          THE COURT:  Mr. Lennon?
          MR. LENNON:  Good afternoon, your Honor.
          THE COURT:  And Mr. Duffy?
          MR. DUFFY:  Yes, your Honor.
          THE COURT:  Does your colleague have a name.
          MR. McCARTHY:  Yes, your Honor, Brian McCarthy.  I am
an associate with the firm.
          THE COURT:  You are entitled to have a listing.
          This is the return of an order to show cause brought
by defendants requiring plaintiff to show cause why an
attachment was appropriately granted.
          We are dealing with the supplemental rules in
admiralty for in rem attachments.  The defendant raises several
points.  The two important ones seem to be that the complaint
                         Page 1

Transcript of Hearing on October 10, 2006.txt

16   does not state an in personam claim against the defendants and
17   that there is more than enough security elsewhere, if any is
18   needed, and none is needed in this district.
19              Do I have that right, Mr. Lennon?
20        MR. LENNON:  That's how I interpret their motion
21   papers, your Honor.
22        THE COURT:  Do I have it right, Mr. Duffy?
23        MR. DUFFY:  Yes, your Honor.
24        THE COURT:  Mr. Lennon, all I have from you is a
25   letter of October 4.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanmaln                                                            3

1         Am I missing something?
2         MR. LENNON:  Yes, you are, your Honor.  You are
3    missing -- and I can't explain why, but you are missing our
4    October 6, 2006, memorandum of law.
5         THE COURT:  I have that.  Sorry.
6         MR. LENNON:  You should also have two declarations.
7         THE COURT:  The statement of Mr. Nicholas Pontelas.
8         MR. LENNON:  I believe those are the defendants'
9    papers, your Honor.
10        THE COURT:  I have the defendants' papers.  I don't
11   have yours.
12        Will you look at these papers and see if they include
13   yours.  If not, we may need an extra copy of yours.
14        MR. LENNON:  Those are all Mr. Duffy's papers.
15        THE COURT:  With your indulgence, I will look at your
16   papers.
17             (Pause)
18        THE COURT:  Mr. Duffy?
19        MR. DUFFY:  Yes, your Honor.
20        THE COURT:  If you look at paragraph 17 of the
21   complaint, plaintiff alleges in the second part of the
22   allegation that defendant Malev is merely a shell corporation
23   through which Evalend conducts its business.
24        And in the next paragraph, that Evalend and Plumfield
25   are alter egos of Malev because they dominate and disregard

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanmaln                                                            4

1    Malev's corporate form to the extent that Evalend and Plumfield
2    are actually carrying on Malev's business and operations as if
3    the same were its own.
4         Recognizing that I am not supposed to evaluate the
5    facts, but just look at the legal sufficiency of the
6    allegations, don't those legally sufficiently allege personal
7    liability against Plumfield and Evalend?
8         MR. DUFFY:  I would say no, your Honor.
9         The reasons are they are conclusory allegations.  I
10   think, whatever standard that one applies, whether it's the
11   reasonable grounds, probable cause, or even the state standard,
12   as in some of the cases that I cited in my brief, there has to
13   be some sort of factual support for conclusory allegations when
14   you are alleging alter ego.  I believe that those allegations
15   in and of themselves do not support a claim for alter ego.
16        THE COURT:  Mr. Lennon, on a defense of a motion to
17   vacate the attachment, shouldn't you be required to come
18   forward with the bases for these allegations?
19        MR. LENNON:  The short answer, your Honor, is no.
20        I am not required to.  I can understand why the Court
Page 2

Transcript of Hearing on October 10, 2006.txt

21  would certainly be interested in understanding the context of
22  the allegations.  But the Second Circuit made clear in
23  Aquastolle, Judge Wood, Chief Judge Wood --
24          THE COURT:  If you move that mic closer to you, it
25  will pick your voice up very well.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanmaln                                                        5

1          MR. LENNON:  Chief Judge Wood made clear in a recent
2  Tideline case, a decision she rendered this summer, and Judge
3  Castel just last week discussed all of the same issues that are
4  being raised here in terms of the sufficiency of alter ego
5  allegations in a maritime attachment context.
6          Aquastolle did not itself deal with an alter ego
7  claim, but the Tideline case and the Judge Castel's case did.
8  Those cases basically held, following Aquastolle, that when a
9  maritime attachment issued on the basis of alter ego
10  allegations is challenged, the question isn't whether we are
11  going to ultimately prove at the time of trial whether or not
12  these companies are alter egos, have we pled it, have we
13  asserted legally sufficient maritime claim against the
14  defendant in the case.
15          What we said here, and I think it is a quite plain
16  from the pleadings themselves, are that the defendants
17  contracted with our client.  Malev is a mere shell corporation,
18  run by Evalend and Plumfield as alter egos in the sense that
19  they disregarded its corporate form, dominated and controlled.
20          The general maritime law well recognizes alter ego in
21  admiralty cases or the doctrine of alter ego and piercing the
22  corporate veil.  There's a case called Hellbrun Oil --
23          THE COURT:  Isn't there some due process requirement
24  that there be some substance to the allegations?  That's
25  certainly the case for state law attachments.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanmaln                                                        6

1          MR. LENNON:  Number one, it is not a state law
2  attachment.
3          THE COURT:  I understand.
4          MR. LENNON:  Obviously it's a federal admiralty
5  attachment.
6          THE COURT:  But the Supreme Court in Fuentes v.
7  Chevron was very much concerned about the due process issue
8  where attachments were issued without in that case a hearing,
9  but I would extend it to some showing.
10          MR. LENNON:  There are two issues at play here, Judge.
11  One is the question of whether or not we sufficiently pled a
12  maritime alter ego claim.  I would dare to say that there
13  really isn't any question --
14          THE COURT:  I think you have.
15          MR. LENNON:  -- that we have.
16          In the context of a motion to vacate such as the one
17  that is brought on by the defendant, the court can consider
18  issues and should consider issues going beyond the mere
19  allegations in the complaint.
20          We have submitted a declaration of my colleague, Nancy
21  Peterson, that details the evidence and the basis for these
22  allegations.
23          I think in that context, then, if the court does have
24  due process concerns whether or not there is a scintilla, if
25  you will, of evidence to support the allegations, we would

Page 3

Transcript of Hearing on October 10, 2006.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanma1n                                                                    7

1    carry that burden as well.  Due process concerns I don't think
2    really have any place if we've come forward with good-faith
3    evidence and allegations to support them.
4            THE COURT:  I have your colleague's affidavit,
5    Ms. Peterson's affidavit.
6            What would you suggest I look at?
7            MR. LENNON:  Your Honor, if you look at paragraphs 46
8    through 62.
9            THE COURT:  I will summarize.
10           Ms. Peterson swears that Malev was only a paper
11   company used by Evalend to charter the ship EQUINOX.  It has no
12   discernible assets; that the EQUINOX is no longer doing
13   business; that was its only activity; and that it received
14   payments through another alter ego, Plumfield; that in the
15   arbitration that Evalend and Malev were intertwined and
16   together succeeded in stretching a simple case for London
17   arbitrators into a five-year travail.  They have overlapping
18   directors, overlapping officers.
19           That is it.
20           So Mr. Lennon, Mr. Duffy, would say that that shows a
21   great deal of substance.  Mr. Duffy, the ball is in your court.
22           MR. DUFFY:  Yes, your Honor.  I don't think it shows a
23   great deal of substance.  I think you have to remember in this
24   case what the facts are.  My client Evalend is a professional
25   ship manager.  This is their business.  This is what they do.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

6aanma1n                                                                    8

1    They were incorporated in 1972.  They've never owned ships.
2    They manage ships for other people, much like a port agent in
3    the Port of New York doesn't own ships, but he acts as an agent
4    for people whose ships come in.  We have been doing this since
5    1972.  I think we had six ships in 1994 when Malev was around.
6    We have 13 now.  We have a contract.
7            THE COURT:  We is Evalend?
8            MR. DUFFY:  Evalend.  We had a contract with Malev.
9            THE COURT:  I understand that Malev is the only party
10   to the contract, but the difference between the normal case as
11   a general agent and this case is that the general agent put up
12   a principal that has no substance, according to the
13   allegations.  And the allegations are supported by the Peterson
14   affidavit.
15           MR. DUFFY:  That's not true --
16           THE COURT:  I think there's enough.
17           MR. DUFFY:  -- that the principal put up a company
18   with no substance.
19           THE COURT:  That the agent put up a company with no
20   substance, Malev, having no substance except one ship, EQUINOX.
21           MR. DUFFY:  No.
22           Your Honor, I think if you look at some of these
23   cases, the plaintiff here, Secil, freely entered into a
24   contract with Malev.  If Secil had any concern about Malev,
25   they could have asked for guarantees on the part of anybody
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

6aanma1n                                                                    9

1    else.

Page 4

Transcript of Hearing on October 10, 2006.txt

2    This is fairly common in the shipping business.  Secil
3  didn't do that.  They didn't rely on Malev on Evalend.  Evalend
4  was an agent for a disclosed principal.  They knew who they
5  were dealing with, and they dealt with them.
6    They had a bad falling out.  Things didn't go well.
7  They got most of the principal of their claim, the only reason
8  they're still sniffing around for money is because they didn't
9  get enough security in the first instance, and they're trying
10 to get the interest now, which is three times the amount of the
11 claim after these couple of years.
12    THE COURT:  Does Mr. Lennon's view of the Tideline
13 decision by Judge Wood, Rout Holding, the decision by Judge
14 Castel, and D.S. Bulk, the decision by Judge Stein, are those
15 decisions that fairly support his point of view?
16    MR. DUFFY:  Your Honor, to be quite honest, I disagree
17 with -- not necessarily disagree with the outcome in Tideline.
18 I disagree with the analysis for two reasons.
19    One, I find --
20    THE COURT:  Judge Wood's or Mr. Lennon's?
21    MR. DUFFY:  Judge Wood's in Tideline.  I find the
22 authority conflicting in there.  I would disagree with Judge
23 Wood and say that Aquastolle did not change the landscape for a
24 straight claim that is not coming under the heading of an
25 equitable claim.  In this case we are challenging the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanma1n                                                          10

1  sufficiency of the complaint right out at the start.  That is a
2  technical requirement of Rule (b), to make, as I think Judge
3  Castel commented, said plaintiff has to assert a valid maritime
4  claim.
5    THE COURT:  Don't you think this is?  What's legally
6  deficient about it?
7    MR. DUFFY:  It's conclusory allegations with no
8  factual support to it, your Honor.
9    THE COURT:  I don't think you need a detailed brief to
10 have a legally sufficient cause of action.
11    The bottom line is this:  I think there is a legally
12 sufficient claim that is stated.  I think there is sufficiently
13 substantial support set out in the papers, and I, therefore,
14 deny the motion to vacate the attachment.
15    However, what is really needed are depositions.  And I
16 would like to see the two of you get involved with depositions
17 immediately.
18    That raises, Mr. Duffy, the question of your
19 appearance.  You only have a special appearance.  In
20 challenging this attachment, I'm not sure that you can't do it
21 consistent with only a special appearance.
22    MR. DUFFY:  If I may, your Honor, I would like to add
23 this is one of the deep concerns of people in the situation of
24 Malev.  They have no other jurisdictional connection here with
25 New York.  This case has no jurisdictional connection with New

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6aanma1n                                                          11

1  York.  Their funds were attached in connection with other
2  business that they're doing, and now they are being forced to
3  come in here and defend themselves on allegations of alter ego
4  on flimsy conclusory allegations.
5    THE COURT:  Malev is a charter party.  You can't worry
6  about Malev.  If anyone is liable, they're liable on the

Page 5

Transcript of Hearing on October 10, 2006.txt

7   contract. They signed the charter party. You are not worried
8   about Malev. Your worry is about Evalend and Plumfield.
9       MR. DUFFY: Yes. Their business is frozen, and in the
10  course of their business they transfer money all around the
11  world because they're working for a couple of different ship
12  owners. That's the only connection with New York, and now they
13  have to come in here and defend themselves against alter ego
14  allegations with no basis to them?
15      THE COURT: I think there's sufficiently alleged here
16  and sufficiently supported to sustain the attachment. I so
17  rule.
18      However, if you would like to challenge the proofs
19  that Mr. Lennon has gathered to this extent, by depositions, or
20  if Mr. Lennon would like to further document his case by
21  depositions, I'm agreeable to that. I would encourage that in
22  fact. That's what will get us the true facts.
23      Maybe that's the way to do it. At the present time I
24  am a sustaining the attachment.
25      MR. DUFFY: By depositions, your Honor?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6aanmaln                                                    12
1       THE COURT: The next issue has to do with adequacy of
2   security.
3       MR. DUFFY: The issue also I would raise is, I mean
4   that my clients have to come here to the United States.
5       THE COURT: Right.
6       MR. DUFFY: I don't believe they should.
7       THE COURT: Where would you like to have them deposed?
8       MR. DUFFY: Their office.
9       THE COURT: Where is their office?
10      MR. DUFFY: Greece.
11      THE COURT: I am not sure you can take a deposition in
12  Greece.
13      MR. DUFFY: I am not positive that you can.
14      THE COURT: How about London?
15      MR. DUFFY: I would have to look into that, your
16  Honor.
17      THE COURT: I'll order depositions in London. That's
18  where the arbitration is going on. This will clearly help the
19  arbitration as well.
20      Talk about the adequacy of security. Make a showing,
21  Mr. Lennon, about the adequacy of the security. Why do you
22  need the attachment?
23      MR. LENNON: Your Honor, the point that was raised
24  about adequacy of security really goes to the question about a
25  bank guarantee that was issued in South Africa.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6aanmaln                                                    13
1       THE COURT: Which is conditional?
2       MR. LENNON: It was not only conditional, but it was
3   also provided to us by a party that is not a defendant in this
4   case here in New York.
5       THE COURT: If it's absolute, and there is substance
6   behind it, why do you care? The question is that it's not
7   absolute. It's conditioned on what?
8       MR. LENNON: It's conditional on our being able to
9   establish that that entity, whole Proffer Shipping we need to
10  show that Proffer Shipping is --
11      THE COURT: It is not adequate security.
                        Page 6

Transcript of Hearing on October 10, 2006.txt

12     MR. LENNON:  -- a related company to Malev.
13     THE COURT:  You would have to go into another trial to
14  prove this trial.
15     MR. LENNON:  Correct.
16     THE COURT:  No.  Not adequate security.  I take your
17  position.
18     MR. LENNON:  Thank you, your Honor.
19     MR. DUFFY:  Your Honor, if I could just address that
20  point.
21     THE COURT:  Yes.
22     MR. DUFFY:  That makes no sense to me because they are
23  alleging in a foreign jurisdiction that Proffer is the alter
24  ego of Malev and that's the way they're going after that
25  security.  They're saying that's conditional on us proving the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

6aanmaln
1  alter ego.
2     Whatever security they have here against us, it is
3  also conditional against them proving alter ego.  In this case,
4  if they came in and said, well, we have two defendants now,
5  your Honor, we want to be fully secured from Plumfield and
6  Evalend, I don't think you would give them double security on
7  both of them.
8     They have the security in South Africa.  The bottom
9  line is they know it is not fair to have double security
10  because they offered to return that in order to sustain this
11  one when I brought it up.  I don't think they should be allowed
12  to have double security in two jurisdictions and pursue alter
13  egos on different theories.
14     THE COURT:  It's plain to me that the Proffer
15  guarantee is not adequate security.  Whether or not security in
16  this case would be too much in relationship to the South
17  African guarantee I'll leave to South Africa, but in terms of
18  my court, the South African guarantee is not adequate.  I so
19  rule.
20     So the motion brought by the defendants to vacate the
21  attachment is denied.
22     Gentlemen, where do we go from here?
23     MR. LENNON:  Your Honor, based on your ruling that
24  depositions go forward immediately, I guess we need to
25  confer --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

6aanmaln
1     THE COURT:  I am not necessarily doing that.  What do
2  you need now?  What do you need now to perfect your attachment.
3     MR. LENNON:  Well, basically, your Honor, this
4  proceeding here is actually to enforce an arbitration award
5  that we have obtained in London.
6     THE COURT:  Which I haven't ruled on yet.
7     MR. LENNON:  You haven't ruled on it yet.
8     THE COURT:  Have the papers been completed?
9     MR. LENNON:  We need to submit to your Honor a
10  petition to confirm that award into a judgment here.
11     THE COURT:  That's what you ought to do posthaste.
12  So when are you going to do that?
13     MR. LENNON:  I can do that within two weeks, your
14  Honor.
15     THE COURT:  How much time to oppose?
16     MR. DUFFY:  Well, your Honor, if we are opposing it --

Page 7

Transcript of Hearing on October 10, 2006.txt

17  I mean, the only reason I would be opposing it is because my
18  clients, Evalend and Plumfield, are not parties to the
19  arbitration.  The arbitration award isn't enforceable against
20  them, and that's the same question we have here today.
21      THE COURT:  That's a point that we will have to deal
22  with.
23      MR. LENNON:  I guess, your Honor, what I would
24  suggest, then, is there would be no opposition to the petition
25  to actually convert the --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

6aanma1n

1      THE COURT:  I'll look at it.  If Plumfield and Evalend
2  are not parties to the arbitration, you will have to make a
3  showing that they are justly bound by the arbitration award.
4  There are grounds to do that.  But then that would turn the
5  ball back to Mr. Duffy's court, and he's going to have to come
6  back and object to that, which will require an appearance.
7      You are not going to get ready in two weeks.  Why
8  don't you take an extra week.  Three weeks.  Put in your papers
9  on justification for holding Evalend and Plumfield.  There is a
10  lot of cases that deal with third parties being held for
11  arbitration awards, and the law is difficult and technical and
12  I would like a full briefing on the issue.  Then Mr. Duffy will
13  have time after that.  I'll give him another two weeks to deal
14  with that issue.  I will give you one week to reply.
15      So this is how the schedule will go.
16      Mr. Lennon will have all his motion papers complete by
17  October 31.  Mr. Duffy then will have until November 14.
18  Mr. Lennon will have until November 21, by which time the
19  motion will be complete.
20      There is no allowance for motions to vacate the
21  arbitration award in the schedule.  If Mr. Duffy wants to do
22  that, that motion will be due October 31 as well.  So you are
23  running on an identical track.  But I don't want a cross-motion
24  coming in at a later date from the original motions.  All
25  motions by October 31.  All oppositions by November 14.  All

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

6aanma1n

1  replies by November 21, by which time briefing is complete.  I
2  will not entertain motions for adjournments.  That will be the
3  schedule.
4      MR. DUFFY:  Your Honor, if I just may be clear on
5  this.  As I understand it, he's going to move to confirm the
6  arbitration award against the three parties that are defendants
7  here, and my understanding of the law is he has to prove that
8  we are either a party to the contract or the alter ego of
9  the --
10      THE COURT:  I don't know what the law is, but whatever
11  the law is he's going to have to prove his entitlements to
12  judgments against Evalend and Plumfield.
13      MR. LENNON:  Your Honor, if I may be heard.
14      THE COURT:  We are not arguing that point now.  That's
15  what your burden is.
16      MR. LENNON:  I am not disagreeing with that.  I am not
17  disagreeing with the approach on the petition and opposition.
18  I guess what I'm slightly confused by, or maybe I have the same
19  concern that Mr. Duffy has, is if it's my burden to prove the
20  alter ego, and of course it is, and we haven't actually had any
21  discovery on the issue before the motion papers are filed, I am

Page 8

Transcript of Hearing on October 10, 2006.txt
22  not quite sure where that gets us because I think he would be
23  saying the same things he's saying now then.
24      THE COURT:  One thing you can do is ask for discovery.
25  I will relax the schedule to -- I'll give you discovery.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6aanmaln                                                        18

1       If Mr. Duffy does not want to bring his clients to
2   London, you may have to take your discovery in Greece.
3       MR. LENNON:  That I understand, your Honor.  I guess I
4   would add to that, that, you know, if it turns out that this
5   has all been a huge mistake on our part, which of course I
6   would seriously doubt, I think the benefit of discovery will
7   let us know that, and it may not be necessary.
8       THE COURT:  I agree with you.  And I think Mr. Duffy
9   should agree as well.  Besides, London is a very nice place to
10  visit.
11      MR. LENNON:  How should we proceed, then, in terms of
12  a schedule?
13      THE COURT:  Do you want to make a motion for
14  depositions?
15      MR. LENNON:  I think in order to prove it in terms of
16  the sense of carrying at trial an evidentiary burden, I don't
17  have enough at the moment.
18      THE COURT:  Why don't you make a motion to obtain
19  permission for depositions in Greece.  You would have to look
20  and see under Greek law and Greek procedure whether you can
21  take an American-style deposition there or you are relegated to
22  a procedural posture that is required by Greek law.  You will
23  also have to consider that your opponents may delay you in an
24  extraordinary fashion.
25      MR. LENNON:  I believe they probably could if they
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6aanmaln                                                        19

1   were so inclined, your Honor, although I have taken depositions
2   in Greece before, American-style depositions, by agreement of
3   the parties.  I guess the question is whether they would agree
4   or not.  I suppose I can confer with Mr. Duffy on that in the
5   coming days.
6       THE COURT:  All right.  Look, this schedule doesn't
7   make sense.  So I think what you need to do is this.  Within
8   two weeks, write a joint letter to me and state your respective
9   positions on the issue of depositions.  Actually, I think we
10  should have a conference.  I will see you on October 27, and
11  you will express your positions to me at that time and I'll
12  figure out what to do next.  9:30, October 27.
13      Mr. Duffy, if by this point you have not converted
14  your special appearance into a general appearance, I will
15  suggest to Mr. Lennon that he agree that further appearance for
16  the conference will not change the quality of your appearance.
17      Agreed?
18      MR. LENNON:  We agree to that now, your Honor.
19      THE COURT:  So I would like to see both of you on
20  October 27.  Let's have a proper discussion.
21      Have you attached anything to date, actually attached?
22      MR. LENNON:  Yes, your Honor.  We have full security.
23      THE COURT:  You have full security now?
24      MR. LENNON:  Yes.
25      THE COURT:  So you are in the driver's seat.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 9

Transcript of Hearing on October 10, 2006.txt
(212) 805-0300

20

6aanmaln

1  Mr. Duffy has to come to you.  Is it cash?
2          MR. LENNON:  Yes.  Cash, your Honor.
3          THE COURT:  You might as well, Mr. Duffy.  You've got
4  to deal with the issues.  You can't delay it anymore.
5          I will see you October 27.  If you cut through this
6  with an agreement, which I think would be the best thing, write
7  to me, give me your joint proposal for an agreement, and you
8  wouldn't have to come see me and waste your time.  I think what
9  I would be looking to see are depositions in London at a fairly
10 early date followed by a motion schedule.
11
12         MR. LENNON:  Understood, your Honor.  Thank you.
13         THE COURT:  OK.  Thanks very much.
14         MR. DUFFY:  Thank you, your Honor.
15         MR. LENNON:  Thank you.
16         (Adjourned)
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

TIDE LINE, INC.,

                    Plaintiff,

                                        06 CV 1979 (KMW)
                                        ORDER

        -against-

EASTRADE COMMODITIES, INC., and
TRANSCLEAR, S.A.,

                    Defendants.
----------------------------------x

WOOD, U.S.D.J.:

I. Overview

        Defendant Transclear, S.A. ("Transclear") moves to vacate

this Court's March 14, 2006, Ex Parte Order for Process of

Maritime Attachment, as to Transclear only.  For the reasons

given below, the Court grants Defendant Transclear, S.A.'s motion

to vacate this Court's March 14, 2006, Ex Parte Order for Process

of Maritime Attachment, as to Transclear only, grants Tide Line's

request for leave to file an Amended Verified Complaint with a

new request for an Attachment Order so long as no objections are

filed by August 23, 2006, directs that Tide Line file the Amended

Verified Complaint with a new request for an Attachment Order by

August 25, 2006, and stays the release of the attached funds

pending the issuance of a new Attachment Order in connection with

the Amended Verified Complaint and the serving of a new writ of

1

attachment on the bank, so long as the writ of attachment is
served by August 30, 2006.[1]

II. Background

On March 14, 2006, Tide Line Inc. ("Tide Line") filed a
Verified Complaint (the "Complaint"), against Eastrade
Commodities Inc. ("Eastrade Inc.") and Transclear, seeking an ex
parte order for process of maritime attachment and garnishment
pursuant to Rule B of the Supplemental Rules for Certain
Admiralty and Maritime Claims of the Federal Rules of Civil
Procedure ("Supplemental Rule B") and to the Federal Arbitration
Act (originally the United States Arbitration Act), 9 U.S.C. §§ 1
and 8.  The Complaint alleges that: 1) Tide Line, "a foreign
company duly organized and operating under the laws of Greece,"
Compl. ¶ 2, chartered a vessel it owns, the M/V "Levantes A" (the
"Vessel"), to Eastrade Inc., which is, upon information and
belief, "a foreign corporation, or other business entity,
organized under, and existing by virtue of foreign law, with
principal place of business in Panama," Compl. ¶ 5; 2) disputes
arose during the course of the charter party contract; 3)

---

[1] Transclear has also filed an Answer and Counterclaims against
Tide Line Inc. ("Tide Line"), seeking damages for the attachment;
Tide Line has moved to dismiss those counterclaims.  Transclear's
counterclaims and Tide Line's motion to dismiss those
counterclaims will be addressed in a separate order.

Eastrade Inc. breached the contract, resulting in damages to Tide Line for a total sum of $193,198.15; and 4) Tide Line was therefore preparing to initiate arbitration proceedings against Eastrade Inc. (but not Transclear) in London, and expected to recover a total sum of $292,636.28 (including the principal claim, interest, attorneys' fees and costs, and arbitration costs). The Complaint also alleges, upon information and belief, that Transclear "was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law, with principal place of business in Nyon, Switzerland," Compl. ¶ 4, and that: "Upon information and belief, Defendant Transclear acts as paying agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Eastrade," Compl. ¶ 13. This is the only allegation in the Complaint as to Transclear's alleged involvement in the matter. Finally, the Complaint alleges that defendants Eastrade Inc. and Transclear cannot be found within this District within the meaning of Supplemental Rule B but have assets within the district.

On March 14, 2006, based on the Verified Complaint, and the Affidavit in Support of Prayer for Maritime Attachment of Thomas L. Tisdale, Tide Line's counsel ("Tisdale Aff."), and pursuant to Supplemental Rule B, the Court granted Tide Line an <u>Ex Parte</u>

3

Order for Process of Maritime Attachment ("Ex Parte Attachment Order") against the defendants, for the amount of damages stated in the Verified Complaint. On March 22, 2006, Tide Line, pursuant to the Ex Parte Attachment Order, attached the sum of $270,000, belonging to Transclear, at Citibank. See Letter from Thomas L. Tisdale to Transclear S.A. (Mar. 22, 2006), attached as Ex. A to Affidavit of Service, which is attached as Ex. 1 to Tide Line's Proof of Service, dated May 11, 2006. An exchange of correspondence between counsel for Tide Line and Transclear followed; ultimately, Tide Line did not release the attachment.

On June 22, 2006, Transclear moved to vacate the Ex Parte Attachment Order as to Transclear. Judge William H. Pauley III, sitting in Part I, signed an Order to Show Cause, ordering Tide Line to show cause why an order should not be issued, pursuant to Rules B and E of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, vacating this Court's March 14, 2006, Ex Parte Attachment Order as to Transclear, and setting an inquest for assessment of damages against Tide Line for attaching and failing to voluntarily release funds belonging to Transclear.[2] A hearing as to

---

[2] In addition to moving to have the Ex Parte Attachment Order vacated as to it, Transclear filed an Answer and Counterclaims (for "wrongful attachment and abuse of process related to the attachment" and "wrongful attachment and abuse of process related to Plaintiff's refusal to release the funds that are the subject

4

Transclear's motion to vacate was held on July 14, 2006.[3]

## III. Discussion

### A.  Legal Standard

Supplemental Rule B provides, in relevant part:

> If a defendant is not found within the
> district . . ., a verified complaint may
> contain a prayer for process to attach the
> defendant's tangible or intangible personal
> property -- up to the amount sued for -- in
> the hands of garnishees named in the process.
> The plaintiff or the plaintiff's attorney
> must sign and file with the complaint an

---

of the attachment"), seeking damages against Tide Line, and
requesting that Tide Line post counter-security in the amount of
$2 million, pursuant to Rule E(7)(a) of the Supplemental Rules
for Certain Admiralty and Maritime Claims of the Federal Rules of
Civil Procedure.  See Defendant Transclear, S.A.'s Answer and
Counterclaims ("Answer and Countercl."). Tide Line has filed
Cross-Motion to Dismiss Counterclaims.  Transclear's
counterclaims, and Tide Line's motion to dismiss them, will be
addressed in a separate order.

[3] Under Rule E(4)(f) of the Supplemental Rules for Certain
Admiralty and Maritime Claims ("Supplemental Rule E(4)(f)"),
"[w]henever property is arrested or attached, any person claiming
an interest in it shall be entitled to a prompt hearing at which
the plaintiff shall be required to show why the arrest or
attachment should not be vacated or other relief granted
consistent with these rules."  According to this Court's Local
Rules, "[t]he adversary hearing following arrest or attachment or
garnishment that is called for in Supplemental Rule E(4)(f) shall
be conducted by a judicial officer within three court days,
unless otherwise ordered."  Local Admiralty Rule E.1.  In this
case, Judge William H. Pauley III, sitting in Part I, signed the
Order to Show Cause, setting the date of the hearing for July 11,
2006.  As explained in this Court's Order dated July 11, 2006,
the Court adjourned the hearing for further submissions to be
made.

> affidavit stating that, to the affiant's
> knowledge, or on information and belief, the
> defendant cannot be found within the
> district.  The court must review the
> complaint and affidavit and, if the
> conditions of this Rule B appear to exist,
> enter an order so stating and authorizing
> process of attachment and garnishment.  The
> clerk may issue supplemental process
> enforcing the court's order upon application
> without further court order.

Fed. R. Civ. P. Supp. Rule B(1).  As recently summarized by the

Court of Appeals for the Second Circuit:

> To begin the process, a plaintiff must file a
> verified complaint praying for an attachment
> and an affidavit stating that, to the best of
> the plaintiff's knowledge, the defendant
> cannot be found within the judicial district.
> [Fed.R.Civ.P. Supp. Rule B(1).]  If the
> plaintiff's filings comply with these
> conditions, the court must enter an order
> authorizing the attachment, which the
> plaintiff may then serve on any persons in
> possession of the defendant's property
> located within the district.  The order of
> attachment may be requested and granted ex
> parte, though notice of the attachment to the
> defendant via appropriate service is
> required.  Id. Supp. Rules B(2), E(3).

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., No. 05 Civ.

5385, 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *8-

*9 (2d Cir. July 31, 2006).  See also Fed. R. Civ. P. Supp. R. B

advisory committee's note to 1985 Amendment ("[Supplemental Rule

B(1)] envisions that the order will issue when the plaintiff

makes a prima facie showing that he has a maritime claim against

the defendant in the amount sued for and the defendant is not

6

present in the district."). "The power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution," and its "historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *2, 2006 U.S. App. LEXIS 19302, at *6-*7. Accord Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002).

Furthermore, "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rule E(4)(f)"). The Court of Appeals for the Second Circuit has recently, for the first time,[4] spoken "directly on the showing necessary to vacate a maritime attachment under Rule E," Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *4, 2006 U.S. App. LEXIS

---

[4] Because the Court of Appeals' Aqua Stoli decision was issued on July 31, 2006, and this Court asked the parties for some further short letter briefs on a specific point in light of Aqua Stoli, this Court's issuance of an order in this action was accordingly delayed.

7

19302, at *12 – holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of Supplemental Rule B, a district court may vacate an attachment only upon [certain] circumstances," which "can occur where 1) the defendant is present in a convenient adjacent jurisdiction; 2) the defendant is present in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for a judgment," id., 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *2–*3.[5] The Court of Appeals stated, at greater length:

> We therefore hold that, in addition to having to meet the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment. Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E. We also believe vacatur is appropriate in other limited circumstances. While, as we have

---

[5] "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.5, 2006 U.S. App. LEXIS 19302, at *30 n.5. However, the Court of Appeals believes that, under these Supplemental Rules, defendant bears the burden of "establish[ing] any equitable grounds for vacatur." Id.

8

> noted, the exact scope of a district court's
> vacatur power is not before us, we believe
> that a district court may vacate the
> attachment if the defendant shows at the Rule
> E hearing that 1) the defendant is subject to
> suit in a convenient adjacent jurisdiction;
> 2) the plaintiff could obtain in personam
> jurisdiction over the defendant in the
> district where the plaintiff is located; or
> 3) the plaintiff has already obtained
> sufficient security for the potential
> judgment, by attachment or otherwise.

Id., 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28-

*29 (footnotes omitted). The Court emphasized that "Rule B

specifies the sum total of what must be shown for a valid

maritime attachment." Id., 2006 WL 2129336, at *11, 2006 U.S.

App. LEXIS 19302, at *35.

In so holding, the Court of Appeals "reject[ed] the

reasoning of the more recent district court decisions that have

engaged in a broader Rule E(4)(f) inquiry," id., 2006 WL 2129336,

at *10, 2006 U.S. App. LEXIS 19302, at *30 -- including those

that adopted "a needs test, requiring the plaintiff to show that,

even if the defendant cannot be found within the district, the

attachment is necessary to obtain jurisdiction over a defendant

or to secure a potential judgment," id., 2006 WL 2129336, at *10

& n.8, 2006 U.S. App. LEXIS 19302, at *32 & n.8 (citing Ullises

Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318 (S.D.N.Y.

2006); T & O Shipping, Ltd. v. Lydia Mar Shipping Co., 415 F.

Supp. 2d 310 (S.D.N.Y. 2006); Erne Shipping Inc. v. HBC Hamburg

9

Bulk Carriers GmbH & Co., 409 F. Supp. 2d 427 (S.D.N.Y. 2006);

Seaplus Line Co. Ltd. v. Bulkhandling Handymax, 409 F. Supp. 2d

316, 319-20 (S.D.N.Y. 2005); Allied Mar., Inc. v. Rice Corp., No.

04 Civ. 7029, 2004 WL 2284389, 2004 U.S. Dist. LEXIS 20353

(S.D.N.Y. Oct. 12, 2004)).[6]  The Court "also reject[ed] the

approach taken by the district court in Royal Swan Navigation Co.

v. Global Container Lines, Ltd., 868 F. Supp. 599 (S.D.N.Y.

1994)," which "would impose a fact-intensive inquiry into the

substantiality and nature of a defendant's presence in an

adjacent district before deciding whether an attachment should be

vacated."  Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11,

2006 U.S. App. LEXIS 19302, at *34-*35.

    The Court of Appeals' holding and rationale in Aqua Stoli

Shipping Ltd. also strongly undermine the standard, stated in a

number of cases, that the hearing pursuant to Supplemental Rule

E(4)(f) is intended to "'make a preliminary determination whether

there were reasonable grounds for issuing the warrant,'" Ullises

_____

[6] In vacating the judgment of the district court below, the Court
of Appeals also rejected what it characterized as the "needs-
plus-balancing test," Aqua Stoli Shipping Ltd., 2006 WL 2129336,
at *4, 2006 U.S. App. LEXIS 19302, at *10, adopted by the
district court, under which, even if the plaintiff meets its
burden of showing a need for the attachment, a court may vacate
the attachment if the defendant shows that "the hardship the
attachment order imposes on it or others substantially outweighs
any benefit to the plaintiff," Aqua Stoli Shipping Ltd. v.
Gardner Smith Pty Ltd., 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005).

Shipping Corp., 415 F. Supp. 2d at 322 & n.37 (quoting Salazar v. Atlantic Sun, 881 F.2d 73, 79-80 (3d Cir. 1989)), or the attachment, see Ullises Shipping Corp., 415 F. Supp. 2d at 323 n.37 (noting that "[t]he standard applies to post-attachment cases as well as post-arrest cases"). "This standard has been defined as 'probable cause' or 'reasonable grounds.'" Id. at 323 n.37 (quoting Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A., 169 F. Supp. 2d 1341, 1359 (M.D. Fla. 2001)). Under this standard, in order to justify the maintenance of an attachment under Supplemental Rule E(4)(f), a plaintiff bears a higher burden than that imposed by Supplemental Rule B: as a decision adopting this standard states, "although a minimal prima facie showing is sufficient to justify an attachment under Rule B, under Rule E(4)(f), [plaintiff] has the burden of presenting some evidence showing reasonable grounds for the attachment." Id. at 325. Although Aqua Stoli does not explicitly address this "probable cause" or "reasonable grounds" standard, the decision's emphasis that "Rule B specifies the sum total of what must be shown for a valid maritime attachment," id., 2006 WL 2129336, at *11, 2006 U.S. App. LEXIS 19302, at *35 -- including a "valid prima facie admiralty claim against the defendant," id., 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28 -- implies that the "probable cause" or "reasonable grounds" standard is

11

improper insofar as it purports to go beyond this limited inquiry.

For a plaintiff to show that "it has a valid prima facie admiralty claim against the defendant," id., 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28, in the context of maritime attachment, it appears that a plaintiff need not provide anything beyond its Verified Complaint, pursuant to Supplemental Rules B and E.  A court relies only on a plaintiff's complaint to determine if the plaintiff has shown that it has such a claim against the defendant (and on a plaintiff's affidavit to determine whether it appears that the defendant cannot be found within the district).  See Fed. R. Civ. P. Supp. Rule B(1) ("The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment."); see also Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *8-*9 ("a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district" and "[i]f the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment").  Thus, to show that it has a prima facie claim, a plaintiff seeking a maritime

12

attachment need not provide any supporting evidence; its

complaint should suffice.[7]  Furthermore, Aqua Stoli implies that

a plaintiff is likewise not required to provide evidence showing

that it has a claim against defendant, to carry its burden under

Supplemental Rule E(4)(f).  See Aqua Stoli Shipping Ltd., 2006 WL

2129336, at *4, 2006 U.S. App. LEXIS 19302, at *12 (holding that

"once a plaintiff has carried his burden to show that his

attachment satisfies the requirements of Supplemental Rule B, a

district court may vacate an attachment only upon [certain]

circumstances," which are very limited, as discussed above).

But the reverse issue is less clear: when a defendant seeks

---

[7] In this sense, the use of the phrase "prima facie claim," in
the maritime attachment context, differs from the use of that
phrase in other contexts, where it implies an evidentiary
standard, see, e.g., Pittston Coal Group v. Sebben, 488 U.S. 105,
117 (1988); Zuckerbraun v. General Dynamics Corp., 935 F.2d 544,
547 (2d Cir. 1991)  - particularly, the context of employment
discrimination claims, see Swierkiewicz v. Sorema N. A., 534 U.S.
506, 510 (2002) ("The prima facie case [of employment
discrimination] under McDonnell Douglas [Corp. v. Green, 411 U.S.
792 (1973)], however, is an evidentiary standard, not a pleading
requirement.") (The phrase "prima facie case" - which "not only
may denote the establishment of a legally mandatory, rebuttable
presumption, but also may be used by courts to describe the
plaintiff's burden of producing enough evidence to permit the
trier of fact to infer the fact at issue," Texas Dept. of
Community Affairs v. Burdine,  450 U.S. 248, 254 (1981) - is
sometimes used interchangeably with "prima facie claim."  See,
e.g., Furnco Const. Corp. v. Waters, 438 U.S. 567, 575 (1978);
Guo v. U.S. Dept. of Justice, 422 F.3d 61, 64 (2d Cir. 2005);
Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 575 (2d Cir.
2003); Mitchell v. Washingtonville Cent. School Dist., 190 F.3d
1, 6 (2d Cir. 1999); Chere Amie, Inc. v. Windstar Apparel, Corp.,
191 F. Supp. 2d 343, 349 (S.D.N.Y. 2001).)

to have an attachment order vacated, may a plaintiff provide and rely on other submissions, beyond the complaint, to show that plaintiff indeed has a prima facie claim against the defendant, if the plaintiff's complaint is not sufficient in and of itself? One recent case suggests that a plaintiff may rely on other submissions to justify the maintenance of an attachment. See Maersk, Inc. v. Neewra, Inc., No. 05 Civ. 4356, 2006 WL 2168452, at *10, 2006 U.S. Dist. LEXIS 53395, at *30 (S.D.N.Y. Aug. 1, 2006) (noting that "[t]he current motion to vacate [plaintiffs' maritime attachment], however, is not a motion to dismiss; it is a specialized maritime proceeding with the singular purpose of determining the ongoing propriety of a maritime attachment"; further stating that, "[a]ccordingly, the Court's review of whether reasonable grounds exist for the attachment is not limited to allegations in the Complaint"; and concluding that "[t]he totality of Plaintiffs' allegations, including those offered in their opposition briefs, their affidavits, and at the hearing, provide reasonable grounds to believe that [the movant] was intricately involved in events alleged in the Complaint, whether as [a named defendant] or other individuals identified therein"). That case adopts the "reasonable grounds" standard implicitly rejected by Aqua Stoli. But, as discussed above, Aqua Stoli's implicit rejection of that standard is based on the

14

assumption that the standard places a higher burden on a plaintiff, to show more than what is required by Supplemental Rule B; it is not clear that <u>Aqua Stoli</u> implicitly rejects the possibility that a plaintiff could reply on other submissions to bolster its complaint.  At least one case, however, suggests that an attachment must be vacated insofar as it pertains to a claim not made in plaintiff's complaint.  <u>See</u> T & O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310, 316-17 (S.D.N.Y. 2006) (vacating the attachment insofar as it pertained to security for plaintiff's direct losses, because plaintiff made no claim for direct damages in its complaint, even though plaintiff claimed that the complaint sufficiently alleged direct damages, and plaintiff also pointed to his opposition papers and other submissions).  But this case also adopts an approach explicitly rejected by Aqua Stoli, insofar as it focuses on the need for security as a requirement to maintain the attachment; furthermore, the claim it refers to is not the plaintiff's main claim against the defendant but rather a specific claim for a particular category of relief.  These cases, and what Aqua Stoli appears to imply, suggest two possible approaches: first, if a plaintiff's complaint does not, after all, state a prima facie claim in and of itself, the maritime attachment must generally be vacated, because the attachment order should not have been issued

15

under Supplemental Rule B, which focuses only on the complaint (and a plaintiff's affidavit for the separate question of whether the defendant cannot be found in the district); or, second, insofar as the main concern is whether a plaintiff has a "valid prima facie admiralty claim against the defendant," a court must not vacate the attachment on the sole basis that the complaint does not, in and of itself, sufficiently state a prima facie claim, if plaintiff can show that it has such a claim based on a combination of its complaint and any other allegations in other submissions plaintiff provides at that point. Rather than attempting to set forth a general conclusion, the Court will examine this issue further in the specific context of this case, in the next section.

Independently of whether a plaintiff may rely on allegations in submissions other than the complaint, the Court believes that, for the complaint to show a prima facie claim, the complaint must comply with the relevant federal pleading requirements. Tide Line argues that "Rule E(4)(f) does not afford a defendant the opportunity to challenge the sufficiency of the plaintiff's pleadings." Letter from Tide Line to the Court 1 (Aug. 4, 2006). Tide Line, id. at 5, points to Maersk, Inc., 2006 WL 2168452, at *10, 2006 U.S. Dist. LEXIS 53395, at *30 (noting the argument, advanced by the movant seeking to vacate the attachment, "that

16

the Complaint does not sufficiently allege any claim against him, much less a maritime claim . . . because it does not plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure," but refusing to address this argument because the movant filed a motion to vacate a maritime attachment order and not a motion to dismiss, and therefore "the Court will not consider such an argument lest Rule 12(b)(6) be completely subsumed by Supplemental Rule E(4)(f)"). The Court recognizes that a motion to vacate a maritime attachment is different from a motion to dismiss a complaint. But the Court of Appeals recognized, in Aqua Stoli, that "[w]ithout doubt the Rule E(4)(f) hearing provides defendants with an opportunity to argue that the requirements of Rule B were not in fact met — for example, that the defendant turned out to be 'found within the district.'" Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *9. Thus, in seeking to have an attachment vacated, a defendant may argue that a plaintiff does not have a "valid prima facie admiralty claim against the defendant." For the reasons discussed above, it does not appear that the basis of defendant's argument may be that plaintiff has not provided sufficient evidence of such a claim. But it seems that defendant may, under Supplemental Rule E(4)(f), argue that plaintiff's pleadings are themselves insufficient to state such a claim;

17

otherwise, it is not clear how a defendant could argue that the "prima facie claim" requirement of Supplemental Rule B has not actually been met.

Generally, when an action is brought in federal court, a complaint must contain, _inter alia_, only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). See also Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005) (referring to the "bare-bones notice-pleading requirements of Rule 8(a)"). "The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." Swierkiewicz, 534 U.S. at 514. "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake. [The Supreme] Court, however, has declined to extend such exceptions to other contexts." Id. at 513.

Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rule E(2)(a)"), however,

18

requires that, in an action <u>in personam</u> with process of maritime attachment and garnishment, a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Supp. R. E(2)(a). "This standard for the particularity of complaints is more stringent than the pleading requirements of the Federal Rules of Civil Procedure." <u>U.S. v. Premises and Real Property at 4492 South Livonia Road, Livonia, N.Y.</u>, 889 F.2d 1258, 1266 (2d Cir. 1989).

### B. Analysis

The Court now turns to consider whether Tide Line has adequately shown that: "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." <u>Aqua Stoli Shipping Ltd.</u>, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28-*29.[8] Defendant has made no showing, nor is there any indication that,

---

[8] Transclear does not claim that Tide Line has failed "to meet the filing and service requirements of Rules B and E." <u>Aqua Stoli Shipping Ltd.</u>, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28.

this case presents any of the limited circumstances under which the Court of Appeals found, in <u>Aqua Stoli Shipping Ltd.</u>, that a court could equitably vacate a maritime attachment.

### 1. Requirements Other than Prima Facie Claim

The main issue presented here is whether Tide Line has a "prima facie admiralty claim" against Transclear. Tide Line has met the other requirements necessary for the maritime attachment to be maintained: the defendant cannot be found within the district; the defendant's property may be found within the district; there is no statutory or maritime law bar to the attachment.

The second factor — that Transclear cannot be found within this district — is undisputed. Letter from Transclear to the Court 3 (Aug. 3, 2006).

As for the third factor — that Transclear's property may be found within this district — it is shown by the very fact of the attachment. But Transclear argues that the Court of Appeals' <u>Aqua Stoli</u> decision raises a "serious question as to whom Electronic Funds Transfers ("EFTs") belong while in transit," Letter from Transclear to the Court 3 (Aug. 3, 2006); the funds attached here are EFTs.[9] "Under the law of this circuit, EFTs to

---

[9] EFTs function in the following way:

or from a party are attachable by a court as they pass through banks located in that court's jurisdiction." Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *4 (citing Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002)).[10]  In Aqua Stoli, the Court of Appeals questioned Winter

---

> When a customer wants to commence an EFT, its bank sends a message to the transfer system's central computer, indicating the amount of money to be transferred, the sending bank, the receiving bank, and the intended beneficiary. The central computer then adjusts the account balances of the sending and receiving banks and generates a printout of a debit ticket at the sending bank and a credit ticket at the receiving bank. After the receiving bank gets the credit ticket, it notifies the beneficiary of the transfer. If the originating bank and the destination bank belong to the same wire transfer system, then they are the only sending and receiving banks, and the transfer can be completed in one transaction. However, if the originating bank and the destination bank are not members of the same wire transfer system, which is often the case with international transfers, it is necessary to transfer the funds by a series of transactions through one or more intermediary banks.

Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.1, 2006 U.S. App. LEXIS 19302, at *4 n.1 (quoting United States v. Daccarett, 6 F.3d 37, 43-44 (2d Cir. 1993)).  "Because of the international nature of maritime transactions, intermediary banks are frequently used."  Id.

[10] See also Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.1, 2006 U.S. App. LEXIS 19302, at *4 n.1 ("Winter Storm, 310 F.3d at 274-78, permitted the attachment of funds while those funds are in an intermediary bank temporarily as a credit before being passed through to the beneficiary of the transaction or

Storm, "especially its reliance on [United States v.] Daccarett,
6 F.3d [37,] 55 [(2d Cir. 1993)], to hold that EFTs are property
of the beneficiary or sender of an EFT." Aqua Stoli Shipping
Ltd., 2006 WL 2129336, at *11 n.6, 2006 U.S. App. LEXIS 19302, at
*31 n.6.[11]  Nevertheless, the Court of Appeals has not overturned
Winter Storm; this Court therefore continues to be bound by that
decision.

As for the fourth element – whether there is no statutory or
maritime law bar to the attachment – Transclear argues that this
"presents the most compelling argument for vacating the
attachment," Letter from Transclear to the Court 2 (Aug. 3,
2006), but Transclear does not point to an actual statutory or

---

another intermediary bank.").

[11] The Court of Appeals noted, specifically:

> Because Daccarett was a forfeiture case, its
> holding that EFTs are attachable assets does
> not answer the more salient question of whose
> assets they are while in transit. In the
> absence of a federal rule, we would normally
> look to state law, which in this case would
> be the New York codification of the Uniform
> Commercial Code, N.Y. U.C.C. Law §§ 4-A-502
> to 504. Under state law, the EFT could not be
> attached because EFTs are property of neither
> the sender nor the beneficiary while present
> in an intermediary bank. Id. §§ 4-A-502 cmt.
> 4, 4-A-504 cmt. 1.

Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.6, 2006 U.S.
App. LEXIS 19302, at *31 n.6.

maritime law bar to the attachment: rather, Transclear argues

that "Tide Line failed to present evidence to support a finding

of alter ego," id.[12]  This issue is discussed below in connection

with the question of whether Tide Line has shown that it has a

"prima facie admiralty claim."

### 2. Valid Prima Facie Admiralty Claim

As noted earlier, Tide Line's sole allegation against

Transclear, in its Verified Complaint,[13] is that: "Defendant

Transclear acts as paying agent, or arranges for other non-

parties to satisfy the debts and obligations of Defendant

Eastrade." Compl. ¶ 13.  In its submissions opposing

Transclear's motion to vacate the attachment, Tide Line argues

that it has a valid in personam maritime claim against

Transclear, on the sole basis that Transclear is, allegedly, the

alter ego of Eastrade Inc., against whom it is undisputed that

---

[12] Although the factor of a "statutory or maritime law bar" is
not discussed in Aqua Stoli Shipping Ltd., Transclear's argument
pertains to whether or not Tide Line has met its burden of
showing that it has a valid maritime claim against Transclear,
not to whether there is a proscription to the attachment even if
Tide Line has such a claim.

[13] That is, its sole allegation apart from the claim, upon
information and belief, that Transclear "was, and still is, a
foreign corporation, or other business entity, organized under,
and existing by virtue of foreign law, with principal place of
business in Nyon, Switzerland." Compl. ¶ 4.

Tide Line has a valid maritime claim. Pl. Mem. 8-9. Tide Line argues that its Complaint adequately alleges a claim against Transclear based on alter ego liability, and that its other submissions (and its oral argument) in connection with the motion to vacate the attachment further allege and support such an alter ego claim. Pl. Mem. at 10-12. Furthermore, Tide Line asks that, if the Court finds that the Verified Complaint does not adequately allege that Transclear and Eastrade Inc. are alter egos, the Court allow Tide Line to submit an amended complaint containing additional allegations as to Transclear's status as an alter ego of Eastrade Inc., based on new information discovered since the filing of the Complaint; Tide Line also requests that the release of the attached funds be stayed until the Complaint is amended and a new writ is served upon the garnishee bank, because Tide Line claims it will suffer great prejudice if the funds are released. Pl. Mem. 11-12; see also Letter from Tide Line to the Court 1-2 (July 11, 2006) (with attached Proposed Amended Verified Complaint); Letter from Tide Line to the Court 2 (July 12, 2006). Transclear argues that Tide Line did not allege, in its Complaint, that Transclear is an alter ego of Eastrade Inc., and Tide Line may therefore not present such a claim at this point, or present evidence in support of it.[14] See

---

[14] Transclear does not argue that an admiralty claim, and a related maritime attachment, cannot be based on alter ego

24

Transclear S.A.'s Memorandum of Law in Support of its Motion to Vacate Maritime Attachment and Garnishment ("Def. Mem.") 10, 12; Transclear S.A.'s Reply Memorandum of Law in Further Support of its Motion to Vacate Maritime Attachment ("Def. Reply Mem.") 5-7; Letter from Transclear to the Court 3 (July 12, 2006) (arguing that, "[a]t a Rule E hearing, the court should not consider any legal theories that were not pled in the complaint on which the attachment was based").[15]  Furthermore, Transclear argues that, even if the Court does consider Tide Line's alter ego allegations and evidence, Tide Line has failed to prove that Transclear is the alter ego of Eastrade Inc.  Def. Reply Mem. 7-9; Letter from Transclear to the Court 2 (Aug. 3, 2006).

a. Alter Ego Liability

"The prerequisites for piercing the corporate veil are as clear in federal maritime law as in shoreside law"[16]: the veil

---

liability.

[15] At oral argument, counsel for Transclear stated that he had not seen Tide Line's motion to amend its complaint, due to a "mix-up in the fax number" which was due to a mistake on the part of Transclear, not Tide Line.  See Transcript of July 14 Oral Argument at 43-44.  Transclear's counsel added that Transclear "would appreciate the opportunity to respond to that."  Id. at 44.  To date, Transclear has not submitted any response to Tide Line's request to amend its complaint, and has not made a written request to be able to file such a response.

[16] "Federal maritime law . . . is the law we apply in an admiralty case."  Kirno Hill, 618 F. 2d at 985.  Cf. Matter of Arbitration between Holborn Oil Trading Ltd. and Interpol Bermuda

25

will be pierced only if a corporation was used by another entity

or individual to "perpetrate a fraud" or was "so dominated" and

its corporate form "disregarded" such that it primarily

transacted the other entity's or individual's business.  Kirno

Hill Corp., 618 F.2d 982, 985 (2d Cir. 1980).  Accord Matter of

Arbitration between Holborn Oil Trading Ltd. and Interpol Bermuda

Ltd., 774 F. Supp. 840, 844 (S.D.N.Y. 1991) ("Federal common law

in the Second Circuit involves a two pronged test for piercing

the corporate veil: the party sought to be charged must have used

its alter ego 'to perpetrate a fraud or have so dominated and

disregarded [its alter ego's] corporate form' that the alter ego

was actually carrying on the controlling party's business instead

of its own.") (quoting Kirno Hill Corp., 618 F.2d at 985);

Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F. Supp. 2d

318, 323 (S.D.N.Y. 2006) ("Federal common law allows piercing of

the corporate veil where (1) a corporation uses its alter ego to

perpetrate a fraud or (2) where it so dominates and disregards

its alter ego's corporate form that the alter ego was actually

carrying on the controlling corporation's business instead of its

own.") (internal quotation marks omitted).  "Under that standard,

'. . . [a]ctual domination, rather than the opportunity to

---

Ltd., 774 F.Supp. 840, 844 (S.D.N.Y. 1991) ("Federal courts
sitting in admiralty must apply federal common law when examining
corporate identity."); accord Ullises Shipping Corp. v. FAL
Shipping Co. Ltd., 415 F.Supp.2d 318, 323 (S.D.N.Y. 2006).

exercise control, must be shown.'" <u>Ullises Shipping Corp.</u>, 415 F. Supp. 2d at 323 (quoting <u>De Jesus v. Sears, Roebuck & Co.</u>, 87 F.3d 65, 69 (2d Cir. 1996)).[17]

The Court of Appeals for the Second Circuit has enumerated ten factors that would "tend to show that defendant was a dominated corporation," <u>Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.</u>, 933 F.2d 131, 139 (2d Cir. 1991):

> (1) the absence of the formalities and
> paraphernalia that are part and parcel of the
> corporate existence, i.e., issuance of stock,
> election of directors, keeping of corporate
> records and the like, (2) inadequate
> capitalization, (3) whether funds are put in
> and taken out of the corporation for personal
> rather than corporate purposes, (4) overlap
> in ownership, officers, directors, and
> personnel, (5) common office space, address
> and telephone numbers of corporate entities,
> (6) the amount of business discretion
> displayed by the allegedly dominated
> corporation, (7) whether the related
> corporations deal with the dominated
> corporation at arms length, (8) whether the
> corporations are treated as independent
> profit centers, (9) the payment or guarantee
> of debts of the dominated corporation by
> other corporations in the group, and (10)
> whether the corporation in question had
> property that was used by other of the
> corporations as if it were its own.

---

[17] Even sole ownership of a corporation is not sufficient, by itself, to pierce the corporate veil. <u>Kirno Hill Corp.</u>, 618 F.2d at 985. "Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." <u>American Protein Corp. v. AB Volvo</u>, 844 F.2d 56, 60 (2d Cir. 1988).

27

Id. at 137-39.[18] "Applying these – or any other pertinent
factors – to the infinite variety of situations that might
warrant disregarding the corporate form is not an easy task
because disregarding corporate separateness is a remedy that
'differs with the circumstances of each case.'" Id. (quoting
American Protein, 844 F.2d at 60).

b. Tide Line's Burden

In their submissions to the Court – which were filed before
the Court of Appeals issued its decision in Aqua Stoli Shipping
Ltd. – the parties both argued that "[a]t a post-attachment
hearing, a plaintiff asserting corporate alter egos need not
definitively establish domination and control, but must present
enough evidence to convince the court that there are reasonable
grounds for piercing the corporate veil," Ullises Shipping Corp.
v. FAL Shipping Co. Ltd., 415 F. Supp. 2d 318, 323 (S.D.N.Y.
2006). See Pl. Mem. 7, 15 (adopting this standard but citing
other cases); Letter from Transclear to the Court 3 (July 12,
2006) (stating this standard but arguing that it applies only if

---

[18] This decision addressed New York law concerning piercing the
corporate veil. But "the standards for piercing the veil under
New York and federal common law . . . converge, requiring a
showing of either fraud or domination." Matter of Arbitration
between Holborn Oil Trading Ltd. and Interpol Bermuda Ltd., 774
F. Supp. at 844. In that maritime case, the Court looked to the
factors set forth in Wm. Passalacqua Builders, Inc., 933 F.2d at
137-139.

alter ego liability is pled in the complaint).  In connection
with the motion to vacate the maritime attachment order, the
parties provided affirmations and declarations to support their
positions as to whether or not there are "reasonable grounds to
pierce the corporate veil" here, as to Transclear.  See
Affirmation of Tina Elliott (Executive Officer of Transclear) in
Support of Motion to Vacate Maritime Attachment ("Elliot Aff.");
Reply Affirmation of Tina Elliott in Further Support of Motion to
Vacate Maritime Attachment ("Elliott Reply Aff."); Declaration of
Nancy R. Peterson (counsel to Tide Line) in Support of
Plaintiff's Opposition to Motion to Vacate Maritime Attachment
and in Support of Cross-Motion to Dismiss Counterclaims
("Peterson Decl.") and attached exhibits; Declaration of Kyriakos
Linas (director of Tide Line) in Support of Plaintiff Tide Line
Inc.'s Opposition to Motion to Vacate the Maritime Attachment;
and the Declaration of Vassiliki Sekrou (third-party employee) in
Support of Plaintiff's Opposition to Motion to Vacate Maritime
Attachment ("Sekrou Decl.").  The oral argument that was held
pursuant to Supplemental Rule E(4)(f) (and before the Court of
Appeals' Aqua Stoli decision) also focused primarily on the
factual record.

However, as discussed above, the holding and overall
rationale of Aqua Stoli Shipping Ltd., 2006 WL 2129336, 2006 U.S.

29

App. LEXIS 19302, imply that the "probable cause" or "reasonable grounds" standard is generally improper when considering whether a maritime attachment must be vacated.  Under this logic, the Court should not engage in a broad inquiry into evidence presented as to Transclear's relationship with Eastrade Inc. Rather, the Court must focus on the narrower question of whether Tide Line has shown that it has a valid prima facie claim against Transclear on the basis of alleged alter ego status.[19]

c. Whether Tide Line Has Met this Burden

Tide Line argues that its Verified Complaint sufficiently

---

[19] Transclear argues that the Court of Appeals' decision in Aqua Stoli "has absolutely no bearing on the standard of proof regarding Tide Line's belated alter ego allegations because: (i) there were no alter ego allegations at issue in Aqua Stoli, and (ii) the Second Circuit in Aqua Stoli did not address or modify the longstanding Second Circuit authority as to what needs to be proven to show alter ego liability and pierce the corporate veil."  Letter from Transclear to the Court 1-2 (Aug. 3, 2006). The Court finds this argument unconvincing: although Aqua Stoli did not involve an alter ego claim, and certainly did not address the factors that tend to show alter ego liability, Aqua Stoli does, for the reasons already discussed, have ramifications as to a plaintiff's burden to maintain an attachment -- including when plaintiff asserts that it has a maritime claim against the defendant based on alter ego liability; there is no reason why, for such a claim, plaintiff would be held to a "probable cause" or "reasonable grounds" standard rather than the "prima facie" requirement emphasized by the Court of Appeals in Aqua Stoli. Similarly, therefore, Transclear's assertion that, although Tide Line has an admiralty claim against Eastrade, Inc., it does not have a claim against Transclear "absent a finding of alter ego" or a "prior determination that Transclear is the alter ego of Eastrade, Inc.," Letter from Transclear to the Court 1 (Aug. 3, 2006), is incorrect.  Such a "finding" or "prior determination" is not a prerequisite to maintaining the attachment.

alleges that Eastrade Inc. and Transclear are alter egos because
"[f]ederal pleading requirements are very liberal," Pl. Mem. at
10,[20] there are "no magic words to allege alter ego," id. at 11,
and "[p]aying the debts of another 'independent' company or
arranging for others to pay another 'independent' company's debts
is one of the main hallmarks of alter ego status," id.  Tide Line
further states that when it filed the Verified Complaint, it was
trying to be "cautious" and to allege only those elements
regarding Transclear that it could verify at that time.  Id. at
11-12.  In response to the Court's Order of July 11, 2006,
directing the parties to provide, inter alia, a definition of
"paying agent," and analysis of the legal implications to be
drawn from such an allegation, Tide Line states that the term
"paying agent" "is not specifically defined by statute"[21]; Tide
Line offers the definition of "making payments or guaranteeing
the debts of the dominated corporation," and argues that its use
of the term was intended to refer to aspects of "alter ego"
status (including factors 7 through 10 discussed above); Tide
Line therefore claims that the "legal consequences of being a

---

[20] Tide Line refers only to Fed. R. Civ. P. 8(a)(2), and does not
address Supplemental Rule E(2)(a).  Transclear does not address
the question of what pleading rule applies here.

[21] Transclear likewise responds that, insofar as it is aware,
"paying agent" does not have a technical or specialized meaning
and is not a term of art.  Letter from Transclear to the Court 1
(July 12, 2006).

'paying agent' as defined [here] is [sic] that there are reasonable grounds to find that an entity is in an alter ego relationship." Letter from Tide Line to the Court 1-2 (July 12, 2006). Tide Line thus restates its argument that the allegation in its Complaint was intended to refer to alter ego liability. Transclear responds that "Tide Line could and should have said 'alter ego,' or 'control' or 'domination,' the hallmarks of [alter ego] theory," Def. Reply Mem. 6; Transclear contends that it understood the phrase "paying agent," in the context in which it was used, "to mean an entity that acts as the 'treasurer' or agent of another entity, with the agent issuing payments for the principal out of funds provided by the principal," Letter from Transclear to the Court 1 (July 12, 2006).

The Court finds that Tide Line's Verified Complaint does not, in and of itself, state a prima facie maritime claim against Transclear on the basis of alter ego liability. First, and most obviously, Tide Line does not use the phrase "alter ego" in its Verified Complaint.[22] Furthermore, although a court may find

_____

[22] Cf. Tramp Oil & Marine, Ltd., No. 03 Civ. 5265, 2004 WL 1040701, at *2, 2004 U.S. Dist. LEXIS 7974, at *3 (S.D.N.Y. May 7, 2004) (finding that order of attachment should not be vacated because plaintiff had a prima facie in personam claim against defendant, insofar as plaintiff alleged that the defendant was jointly and severally liable as a partner of another defendant). In that case, which Tide Line cites, see Pl. Mem. 7, it appears that the plaintiff specifically alleged, in the complaint, that the defendant seeking to vacate the attachment was a partner of

32

that, where "alter ego" "is not specifically pled, the factual allegations [in a complaint] may support the maintenance of a claim based on an alter ego theory of liability," <u>Shamis v. Ambassador Factors Corp.</u>, 34 F. Supp. 2d 879, 899 (S.D.N.Y. 1999), the sole allegation that an entity is a "paying agent, or arranges for other non-parties to satisfy the debts and obligations of" another entity, does not suffice to allege a prima facie claim of alter ego liability.  This statement does not meet the more particularized pleading standard set forth in Supplemental Rule E(2)(a) -- nor even, arguably, the more liberal standard of Rule 8(a), <u>see</u> <u>EED Holdings v. Palmer Johnson Acquisition Corp.</u>, 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (stating that "conclusory" allegations regarding veil-piercing "fail to satisfy even the more lenient Rule 8(a) pleading requirements").

However, Tide Line has provided further allegations (and evidence) pertaining to its claim that Transclear is the alter ego of Eastrade Inc. in its submissions in connection with the motion to vacate the attachment.  In addition, Tide Line asks that the Court allow Tide Line to submit an amended complaint containing these additional allegations as to Transclear's status as an alter ego of Eastrade Inc.[23] - including that: "Upon

the other defendant.

[23] Although Tide Line has not made this request through a formal motion to amend pursuant to Federal Rules of Civil Procedure

33

information and belief, Eastrade Commodities Inc. is merely a shell-corporation through which Transclear conducts its business," Proposed Amended Verified Complaint (attached to Tide Line's letter to the Court dated July 11, 2006) ¶ 13; "Transclear operates Eastrade Commodities Inc. as its 'chartering arm,' such that Eastrade has no separate, independent identity from Transclear," id. ¶ 14; "Furthermore, Transclear is the alter ego of Eastrade Commodities Inc. because Transclear dominates and disregards Eastrade Commodities Inc. corporate form to the extent that Transclear is actually carrying on Eastrade Commodities Inc. business and operations as if the same were its own," id. ¶ 15; "Upon information and belief, Eastrade Commodities, Inc. has no corporate existence of its own. Eastrade Commodities Inc. has no identifiable assets, employees or office in Panama," id. ¶ 18; "Upon information and belief, Transclear makes payments on Eastrade Commodities, Inc.'s behalf where Transclear has absolutely no contractual obligation to Eastrade Commodities Inc.'s creditors; on March 11, 2005, Transclear made a hire payment to Tide Line on behalf of Eastrade Commodities Inc. even though Transclear was not referenced in the charter party, and no evidence of an indemnification agreement has been produced," id. ¶ 21; "In another, independent maritime attachment case against

---

15(a), the Court will consider the request.

34

Eastrade, Transclear was caught paying Eastrade Commodities
Inc.'s debts once again," id. ¶ 23; "The only person to respond
to the Notice of Attachment was Ms. Tina Elliott, who indicated,
on the actual facsimile sent to *Eastrade Commodities Inc.*, and
[sic] that she spoke on Eastrade Commodities Inc.'s behalf," id.;
"No representative of Eastrade Commodities Inc., beside Ms.
Elliott, has come forward to challenge the attachment of Eastrade
Commodities Inc.'s funds.  Furthermore, no employee of Eastrade
Commodities Inc. can be located or identified," id. ¶ 24; "In
addition, even though Transclear had no formal relationship to
the LEVANTES A charter, and Eastrade Commodities Inc. was the
named charterer, almost all correspondence sent to Tide Line and
the charter brokers from the 'charterers' originated from
Transclear," id. ¶ 26; and "Transclear performs corporate
functions on Eastrade Commodities Inc.'s behalf which should be
performed solely by Eastrade Commodities Inc.  Transclear
appointed an arbitrator on Eastrade Commodities Inc.'s behalf in
a 2001 arbitration in which Transclear itself *was not a party*,"
id. ¶ 27.[24]  With these proposed amended allegations, Tide Line

---

[24] The Proposed Amended Complaint also advances three alternative
claims — that Transclear and Eastrade Commodities Inc. are
"partners and/or are joint venturers," id. ¶ 28, or that they are
"affiliated companies" such that one is or soon will be holding
assets belonging to the other, id. ¶ 29, or that "Transclear is
an undisclosed or partially disclosed principal in the charter
parties entered into by Eastrade Commodities Inc., such that

has shown that it has a prima facie claim against Transclear on

the basis of alleged alter ego status.[25]

"A party may amend the party's pleading once as a matter of

course at any time before a responsive pleading is served . . . .

Otherwise a party may amend the party's pleading only by leave of

court or by written consent of the adverse party; and leave shall

be freely given when justice so requires." Fed. R. Civ. P.

15(a).  Rule 15(a) has a "lenient standard." Parker v. Columbia

Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).  "The Second

Circuit has held that a Rule 15(a) motion 'should be denied only

for such reasons as undue delay, bad faith, futility of the

amendment, and perhaps most important, the resulting prejudice to

the opposing party.'" Aetna Cas. and Sur. Co. v. Aniero Concrete

Co., Inc., 404 F.3d 566, 603-04 (2d Cir. 2005) (quoting

Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647,

653 n.6 (2d Cir. 1987)).  Although it is true that Tide Line

could have brought a motion to amend earlier, the Court does not

---

Transclear is liable for Eastrade Commodities Inc.'s debts
related to those transactions," id. ¶ 30.

[25] To re-emphasize, the Court must not decide, at this point,
whether Tide Line has advanced sufficient evidence to support
this claim, or whether Transclear has rebutted such evidence
through its own submissions.  Nor must it decide, for reasons
discussed at length above, whether Tide Line has shown "probable
cause" to believe that Transclear is the alter ego of Eastrade
Commodities Inc.

find that Tide Line's timing rises to "undue delay" in this case. Furthermore, the Court does not find that any of the other factors that would counsel against allowing the amendment are present here. The Court will therefore grant Tide Line's request to amend its Complaint, so long as no objections are filed by Transclear by August 23, 2006.

The question at this point is whether the <u>Ex Parte</u> Attachment Order should be vacated because the original Verified Complaint does not sufficiently state a prima facie alter ego claim against Transclear, or whether it should not be vacated because Tide Line's proposed amended allegations sufficiently state a prima facie alter ego claim against Transclear; furthermore, if the Attachment Order is vacated, the Court must consider whether the release of the attached funds should be stayed, as requested by Tide Line, until the Complaint is amended, a new <u>Ex Parte</u> Attachment Order is issued, and a new writ is served upon the garnishee bank. If the Court were to vacate the attachment now, after granting Tide Line's request to amend its Complaint, the entire proceedings would almost certainly be quickly repeated.[26] It seems that the interests of judicial efficiency would counsel in favor of keeping the

---

[26] Indeed, Tide Line's counsel confirmed as much during the hearing. Transcript of Oral Argument Heard on July 14, 2006 ("Tr.") 42, 47.

37

attachment in place, in light of the amendments to the Verified

Complaint.  The parties have not provided any case law

specifically addressing whether or not such a procedure may be

adopted, and the Court has not found cases on point.[27]  But,

insofar as Tide Line has shown that it has a prima facie claim

against Transclear on the basis of its Proposed Amended Verified

Complaint, the Court does not believe that the purposes of

Supplemental Rules B and E would be served by vacating the

Attachment Order as to Transclear.  However, the most appropriate

procedure to follow appears to be the following:  The Court will

vacate the Ex Parte Attachment Order, allow Tide Line to file its

Amended Verified Complaint with a new request for an Attachment

---

[27] Transclear points to T & O Shipping, Ltd. v. Lydia Mar
Shipping Co. S.A., 415 F. Supp. 2d 310, 317 (S.D.N.Y. 2006), in
which, as discussed earlier, the Court vacated the attachment
insofar as it pertained to security for plaintiff's direct
losses, because plaintiff made no claim for direct damages in its
complaint.  In that case, however, the plaintiff had apparently
not made a request to amend its complaint in that case.  The
Court, after vacating the attachment order, stated that if
plaintiff intended to filed an amended complaint, it could do so
within twenty days.  Id. at 317.  Here, Tide Line has already
requested that it be allowed to filed an amended complaint, and
the Court has granted leave to amend.
Tide Line cites Shamis v. Ambassador Factors Corp., 34 F. Supp.
2d 879, 899, which states that even if an allegation of alter ego
"is not specifically pled, the factual allegations contained in
the Second Amended Complaint may support the maintenance of a
claim based on an alter ego theory of liability."  But this is
not a maritime case, and does not involve a maritime attachment;
therefore, it does not provide any guidance as to whether an
attachment may be maintained on the basis of a subsequent amended
complaint.

Order by August 25, 2006 (so long as no objections are filed by
August 23, 2006), and stay the release of the funds pending the
issuance of the new Attachment Order and the serving of a new
writ of attachment on the bank, so long as such service is
accomplished by August 30, 2006.

    d. Note on Transclear and Arbitration

    The Court notes, however, that there appears to be a larger
issue concerning Tide Line's claim against Transclear -- which,
although it does not in and of itself require that the attachment
be vacated, poses a problem for the unfolding of this action.

    The Federal Arbitration Act ("FAA") applies to arbitration
provisions in "maritime transactions." 9 U.S.C. §§ 1, 2.
Section 8 of the FAA, 9 U.S.C. § 8 – invoked by Tide Line in its
Verified Complaint in seeking the maritime attachment order
(along with Section 1 of the FAA and Supplemental Rule B) –
provides:

> If the basis of jurisdiction be a cause of
> action otherwise justiciable in admiralty,
> then, notwithstanding anything herein to the
> contrary, the party claiming to be aggrieved
> may begin his proceeding hereunder by libel
> and seizure of the vessel or other property
> of the other party according to the usual
> course of admiralty proceedings, and the
> court shall then have jurisdiction to direct
> the parties to proceed with the arbitration
> and shall retain jurisdiction to enter its
> decree upon the award.

"Under § 8, the plaintiff may seize the ship _in rem_, obtain a

39

bond, and proceed with arbitration," <u>Thyssen, Inc. v. Calypso Shipping Corp., S.A.</u>, 310 F.3d 102, 107 (2d Cir. 2002) – or, similarly, may attach other property belonging to the defendant, and proceed to arbitration.

Here, however, Tide Line is not seeking to proceed to arbitration as against Transclear. Despite the claim in Tide Line's Complaint that it sought a maritime order "for the purpose of obtaining personal jurisdiction over the Defendants, compelling <u>them</u> to arbitrate the claims asserted by Tide Line," Compl. ¶ 15 (emphasis added), Tide Line has not sought, and apparently does not intend to seek, to join Transclear to the arbitration proceedings that Tide Line has initiated against Eastrade Inc. Tide Line's Verified Complaint refers to initiating arbitration only as against Eastrade Inc. Compl. ¶ 9. Furthermore, Tide Line's submissions to the Court in connection with Transclear's motion to vacate the attachment nowhere state that Tide Line has attempted, or will seek, to involve Transclear in the arbitration proceedings.

It is not clear why Tide Line has not named Transclear in the arbitration proceedings. At the post-attachment hearing, when questioned by the Court regarding why Transclear is not involved in the arbitration proceeding, if Tide Line claims that Transclear is the alleged alter ego of Eastrade Inc., counsel for

40

Tide Line stated that, although "that would be better answered by the London solicitor," he presumed that Transclear was not named in the arbitration proceeding because "arbitration is by contract" and "the only two parties named in the contract [at issue here] were Tide Line Inc. and Eastrade Commodities, Inc." Tr. 25. In response to the Court's suggestion that an alter ego could nonetheless be brought in, Tide Line's counsel replied: "In London arbitration, I don't expect that anybody would have allowed Transclear to come in when they claimed they're not a party to the contract. That's why we have Transclear here in New York." Id.

Tide Line has not sought to have this Court compel Transclear to participate in the arbitration proceedings; therefore, the Court need not decide whether Transclear could be so compelled.[28] But the Court notes that the Court of Appeals for the Second Circuit "has recognized a number of theories under which nonsignatories may be bound to the arbitration agreements of others," including that of "veil-piercing/alter ego."

---

[28] "Under the [Federal Arbitration Act], as interpreted by the Supreme Court, the general presumption is that the issue of arbitrability should be resolved by the courts." Alliance Bernstein Inv. Research & Mgmt., 445 F.3d 121, 125 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995); AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649 (1986)); accord Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005).

41

Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776
(2d Cir. 1995); accord Sarhank Group v. Oracle Corp., 404 F.3d
657, 662 (2d Cir. 2005).  It is possible that, in this case,
English law applies under the arbitration agreement, and would
bar compelling Transclear to appear in the arbitration.  But,
again, this need not be resolved here.

     Even if Transclear cannot be compelled to join in the
arbitration proceedings against Eastrade Inc., Tide Line has
provided no support for its position that it may, instead,
litigate against Transclear in this Court, see Letter from Tide
Line to the Court at 4 (July 11, 2006), on the basis of an alter
ego theory, as the arbitration proceeds against Eastrade Inc.
Indeed, nothing in the framework set out by Sections 1 and 8 of
the FAA, and Supplemental Rule B, suggests that a plaintiff may
attach a defendant's property, and litigate the liability of the
defendant in federal court, rather than proceeding to
arbitration.  Although this does not suggest that Tide Line does
not have a prima facie claim against Transclear, it does indicate
that, at this point, it is unclear how Tide Line may proceed with
that claim in this Court.  This will need to be addressed
further.

IV.  Conclusion

<div align="center">42</div>

43

For the reasons given above, the Court grants Defendant Transclear, S.A.'s motion to vacate this Court's March 14, 2006, <u>Ex Parte</u> Order for Process of Maritime Attachment, as to Transclear only, grants Tide Line's request for leave to file an Amended Verified Complaint with a new request for an Attachment Order so long as no objections are filed by August 23, 2006, directs that Tide Line file the Amended Verified Complaint with a new request for an Attachment Order by August 25, 2006, and stays the release of the attached funds pending the issuance of a new Attachment Order in connection with the Amended Verified Complaint and the serving of a new writ of attachment on the bank, so long as the writ of attachment is served by August 30, 2006.

SO ORDERED.

Dated:      New York, New York
            August 15, 2006

                                   Kimba M. Wood
                                   United States District Judge

43